RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0401p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TERRY D. WALTON,

    *Plaintiff-Appellant,*

    *v.*

No. 04-1471

FORD MOTOR COMPANY; VISTEON CORPORATION,
Jointly and Severally,

    *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-72979—Robert H. Cleland, District Judge.

Argued: July 20, 2005

Decided and Filed: September 28, 2005

Before: BOGGS, Chief Judge; BATCHELDER and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Maureen M. Crane, PITT, DOWTY, MCGEHEE, MIRER & PALMER, Royal Oak, Michigan, for Appellant. John F. Birmingham, Jr., FOLEY & LARDNER, Detroit, Michigan, for Appellees. **ON BRIEF:** Beth M. Rivers, Megan A. Bonanni, PITT, DOWTY, MCGEHEE, MIRER & PALMER, Royal Oak, Michigan, for Appellant. John F. Birmingham, Jr., Jeffrey S. Kopp, FOLEY & LARDNER, Detroit, Michigan, for Appellees.

---

## OPINION

---

    ALICE M. BATCHELDER, Circuit Judge. Plaintiff-Appellant Terry D. Walton appeals the district court's grant of summary judgment in favor of Defendant-Appellee Visteon Corporation ("Visteon") on Walton's claim that Visteon interfered with his attempt to exercise his rights under the Family Medical Leave Act of 1993 ("FMLA") by terminating him in violation of 29 U.S.C. § 2615(a)(1). Because we find that no reasonable jury could conclude that Walton provided Visteon with adequate notice of his intent to take leave for an FMLA-qualifying injury, we AFFIRM.

1

# I.

Walton was hired as an hourly assembler at the Milan Plant on October 5, 1992.[1] One year later, Walton became a millwright in the maintenance department, a position he held until his employment was terminated in May 2001. A millwright is a skilled tradesman responsible for moving and assembling office furniture, operating heavy equipment, installing conveyor systems, hanging signs, and performing general maintenance around the plant. At all relevant times, Walton was also a member of Local 33, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW").

On April 18, 2001, Walton suffered a knee injury while working in his yard at home after work. Following a briefing in his department on the morning of April 19, Walton informed his supervisor, Pat Nolan, that he had twisted his knee the day before and that he intended to visit the medical department to have his knee evaluated. During his visit to the medical department, the Milan Plant's nurse, Susan Kinnick, made a preliminary diagnosis of a sprain/strain to the left knee and she gave Walton a cold compress, ibuprofen, and an elastic bandage. Walton neither requested leave nor did he obtain leave of absence forms from the medical department.

Following his visit to the medical department, Walton returned to work for the remainder of the morning. At around noon, he informed Nolan that he had scheduled a doctor's appointment for the afternoon of April 19. Nolan cleared Walton to leave for his appointment, and Walton went to the office of Dr. Rex Figy. Dr. Figy examined Walton and gave him a note instructing him to remain off work until he could be evaluated by Dr. Thomas Merritt, an orthopedic surgeon. Walton did not return to work on April 19 or contact anybody at Visteon to inform them of his status.

On April 20, Walton called the Milan Plant's security office and informed security that he had visited the doctor and had been told to stay off work until he could see a specialist on April 24. Security recorded Walton's call in the Hourly Personnel Absence Call-In Log Sheet. The entry indicates that the reason for Walton's absence was that he was "sick" and that his expected date of return was April 24. Floor supervisors and the labor relations department receive a periodic distribution of the Hourly Personnel Absence Call-In Log Sheet, but Walton made no attempt to contact directly his supervisor, the labor relations department, or the medical department to inform them of the actual reason for his absence, and he did not provide anyone at Visteon with any medical documentation supporting his absence.

At his appointment with Dr. Merritt on April 24, Walton was diagnosed with having torn the superficial medial collateral ligament in his left knee. As a result, Dr. Merritt disabled Walton from working until May 28. On April 25, Walton again contacted the Milan Plant's security office and informed security that he had attended his scheduled doctor's appointment on April 24 and had been told to stay off work for the next four weeks. The entry in the Hourly Personnel Absence Call-In Log Sheet on this date also indicates that the reason for Walton's absence was that he was "sick" and that his expected date of return was May 28. Once again, Walton made no attempt to contact his supervisor, the labor relations department, or the medical department, and he did not submit any medical paperwork memorializing Dr. Merritt's disability finding to Visteon.

Consequently, on April 27, Visteon sent Walton a letter by registered mail informing him that he had five business days to contact Visteon's labor relations department or his employment would be terminated. Pursuant to Article VIII, Section 5 of the Collective Bargaining Agreement governing Walton's employment, such "5-day quit letters" provide that "[s]eniority shall be broken"

---

[1] Ford Motor Company ("Ford") transferred its assets located at the Milan Plant to Visteon in April 2000 and Visteon was subsequently spun off as a separate corporation in June 2000. The parties therefore agreed that Visteon was the proper party in interest and the district court accordingly dismissed Ford as a party to this suit.

if the "employee does not, within five (5) working days . . . after notice to report has been sent to him/her, either report to work or give a satisfactory reason for his/her absence . . . provided at least ten (10) working days have elapsed since his/her last day worked." The notice provided: "If you are unable to work because of illness or injury, and so report to the Employment Office within the time stated above, you will be granted a sick leave of absence to cover the period of your disability upon presenting satisfactory evidence thereof."

Although Walton admits that he received a note from the post office notifying him of the certified letter, he maintains that he did not receive the notice until May 8, the same day that he actually retrieved the letter from the post office. Postal records confirm, however, that although Walton did retrieve the 5-day quit letter from the post office on May 8, he was first notified by mail on April 30 that a certified letter awaited him.

Meanwhile, on May 4, Visteon notified Walton's union that Walton's employment was terminated because he had not provided evidence of a qualified leave for his absence between April 20 and May 4, or responded to the 5-day quit notice. On May 9, one day after Walton claims to have received the 5-day quit letter and five days after his termination, he contacted Visteon's labor relations department and he drove to the Milan Plant and gave a copy of the medical notes he had received from his doctors to his UAW representative, Fred Probst, who eventually forwarded the medical documentation to Visteon.[2] Probst also provided Walton with the medical certification paperwork (Form 5166) required to support an approved medical leave while at the Milan Plant on May 9. He then took these forms to the office of his personal physician, Dr. Mary Baldwin, to be completed. The forms were completed and ready for Walton to pick up from Dr. Baldwin's office on May 15. Walton thereafter retrieved the forms and submitted them to Visteon on May 16, and the documents were forwarded to medical department on May 17. Visteon nevertheless refused to reinstate Walton.

Visteon's internal procedures generally require that in order properly to request medical leave an employee must notify the labor relations department within two business days of his initial absence and then complete the requisite FMLA forms to be returned to the medical department. Over the course of Walton's employment with Ford and Visteon, the companies issued multiple notices to employees at the Milan Plant that informed them how to obtain an FMLA leave. The notices were posted on bulletin boards located in the medical office, outside the union benefits office, and near the labor relations office. Visteon also posted and attached a bulletin to hourly employees' paychecks in July 2000 entitled "Family Medical Leave Act of 1993." This particular bulletin recited the proper procedures for requesting FMLA leave and it specifically stated, "Do not request FMLA through security." Because Walton had taken several prior medical leaves, for which he had provided proper notice and submitted the medical certification forms properly, he was aware of Visteon's policy.

Walton nevertheless maintains that throughout his nine years of employment at the Milan Plant it was standard procedure for hourly employees to contact the Milan Plant's security office to report absences for any reason. Several Visteon employees, however, explained that while it was proper to call security to report an absence, the primary purpose of such a rule was to allow shift managers to properly staff the assembly lines and related positions when an employee is calling in for an unscheduled absence. Accordingly, two of Walton's co-workers averred that they knew that merely calling security was not sufficient to request or receive FMLA certification, and Walton himself conceded that he knew security could not grant a medical leave of absence. Visteon's

---

[2] Walton also filed a grievance with his union on May 9, which was denied upon initial review and on appeal. Ultimately, on January 2, 2002, the union withdrew the grievance. Walton subsequently filed a charge with the National Labor Relations Board ("NLRB"), claiming that his union had not properly represented him in his grievance proceedings against Visteon. The NLRB concluded that Walton's union had acted properly.

express prohibition against contacting security to request FMLA leave flows, in part, from the fact that the security guards at the Milan Plant are not Visteon employees, but independent contractors leased from a temporary agency, who are given no FMLA training.

## II.

We turn now to Walton's primary contention on appeal, which is that the district court erred by granting Visteon's motion for summary judgment. We review a district court's grant of summary judgment de novo. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves– (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). It is unlawful "for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). Employers who violate § 2615 are "liable to any eligible employee affected" for damages and appropriate equitable relief. 29 U.S.C. § 2617(a)(1).

Walton argues on appeal that Visteon interfered with his rights under the FMLA by refusing to recognize his absence from April 20 to May 4 as FMLA-qualifying leave. To succeed on his FMLA-interference claim, Walton must demonstrate that: (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). Because the first three factors are not in dispute, the sole issue in this appeal is whether Walton provided adequate notice to Visteon of his need for FMLA leave under the fourth prong of the *Cavin* analysis.

When the need for FMLA leave is unforeseeable, such as here, the pertinent regulations require that

> an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible.

29 C.F.R. § 825.303(a). Visteon's internal procedures require that in order to properly request medical leave an employee "must notify Labor Relations within two business days of [his] absence, or at least within 48 hours of [his] return to work," and then complete the requisite FMLA forms to be returned to the medical department within 15 days of receiving such forms. Visteon's internal procedures are therefore consistent with the FMLA's timing requirements for unforeseeable leave.

It is not disputed that by merely calling the Milan Plant's security office to inform Visteon of his absence, Walton did not comply with Visteon's internal policy for requesting and receiving FMLA leave. Nevertheless, in *Cavin*, we discussed the provisions of the FMLA and the accompanying regulations, and we held that "employers cannot deny FMLA leave on grounds that an employee failed to comply with internal procedures–as long as 'the employee gives timely verbal or other notice.'" 346 F.3d at 722 (quoting 29 C.F.R. § 825.302(d)). Accordingly, because under *Cavin*, Visteon could not terminate Walton simply for failing to comply with internal company policy requiring that he notify the labor relations department of his absence, our focus turns to whether by making two calls to the Milan Plant's security office to report his absences Walton provided Visteon with sufficient notice that he was invoking the protection of the FMLA. We conclude that he did not.

"[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998). "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Id.* (internal quotation marks omitted). While an "employee need not expressly assert rights under the FMLA or even mention the FMLA," 29 C.F.R. § 825.303(b), the employee must give "the employer enough information for the employer to reasonably conclude that an event described in FMLA § [2612(a)(1)(D)] has occurred." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999). "[W]hat is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Cavin*, 346 F.3d at 724 (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)).

Under the facts of this case, Walton cannot carry his burden of establishing that he imparted sufficient notice to Visteon to apprise it of his need to take leave for an FMLA-qualifying injury. On April 19, 2001, Walton informed his supervisor, Pat Nolan, that he had "twisted his knee" and that he planned to get his knee evaluated at the Milan Plant's medical department. During his visit to the medical department, he never indicated that he would need time off and he did not request FMLA certification forms. After receiving an ice pack and ibuprofen from Nurse Kinnick, Walton then *returned to work*. While Walton informed Nolan later that he had scheduled a doctor's appointment for the afternoon of April 19, he never requested leave as a follow up to that conversation. Based on these facts, Walton's supervisor did not have sufficient notice as of April 19 that Walton had suffered a "serious health condition" requiring FMLA leave.

Walton admits that prior to his termination the only other contact he had with Visteon regarding his absence was through his calls to security on April 20 and April 25. These contacts were likewise insufficient to impart notice to Visteon that Walton required FMLA leave. It is undisputed that Walton never made any attempt to contact his supervisor, the labor relations department or the medical department between April 19 and May 9, he failed to respond to a 5-day quit letter, and he did not submit any medical paperwork until nearly two weeks after he was terminated. Importantly, the entries in the Hourly Personnel Absence Call-In Log Sheet on both April 20 and April 25 indicate that the reason for Walton's absence was that he was "sick." In fact, the record reveals that, at least on April 20, Walton specifically told security to list him as taking a "sick day." The district court properly concluded that even if the Hourly Personnel Absence Call-In Log Sheet was forwarded to Walton's supervisor and the labor relations department, the information contained in the log was not sufficient to impart notice to Visteon that Walton required FMLA leave. *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001) ("Sick" does not imply "a serious health condition".); *see also Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 981-82 (5th Cir. 1998) (same).

We recognize that under the applicable regulations "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The

employer will be expected to obtain any additional required information through informal means." 29 C.F.R. § 825.303(b). But we find that by sending Walton a 5-day quit letter by registered mail on April 27, Visteon complied with the FMLA regulations. The letter specifically provided: "If you are unable to work because of illness or injury, and so report to the Employment Office within the time stated above, you will be granted a sick leave of absence to cover the period of your disability upon presenting satisfactory evidence thereof." Postal records show that Walton received notice of the letter on April 30, but that he chose to ignore Visteon's inquiry until after he was terminated. The regulation requires that an employer may sometimes need to seek additional information concerning an absent employee's condition; it does not seek to punish the employer when the employee fails to respond to such an inquiry.

Walton relies on our decision in *Cavin* to support his argument that his calls to security were sufficient to notify Visteon of the seriousness of his medical condition. In fact, Walton argues that the facts in *Cavin* are indistinguishable from the facts of this case. In *Cavin*, we concluded that the fact that the plaintiff informed Honda's security department (rather than complying with internal company policy by notifying the Leave Coordination Department) that he had been in a motorcycle accident which required hospitalization and that he would be unable to perform his job because of the injuries he sustained was sufficient as a matter of law to impart notice to Honda of an FMLA-qualifying decision and we reversed the district court's entry of summary judgment in favor of Honda on the plaintiff's FMLA-interference claim. *Cavin*, 346 F.3d at 725, 727. Because we find the facts of *Cavin* to be distinguishable from the facts of this case, we find Walton's reliance on *Cavin* to be unavailing.

First, Visteon's policies differ from Honda's policies in one very important respect. Visteon explicitly informed its employees, "Do not request FMLA through security." Visteon posted this warning throughout the Milan Plant and also in a July 2000 bulletin entitled "Family Medical Leave Act of 1993" which was attached to hourly employees' paychecks. Walton's claim that he was unaware of this requirement is belied by record. He conceded during his deposition that he knew security could not grant a leave of absence. We have, in any event, held that the "FMLA does not require [employers] to foresee that [an employee] would not have read the many notices that it had sent regarding the FMLA's coverage . . . ." *Brenneman v. MedCentral Health System*, 366 F.3d 412, 425 (6th Cir. 2004). In contrast to the plaintiff in *Cavin*, therefore, Walton knowingly and repeatedly violated Visteon's express prohibition against requesting FMLA leave through the Milan Plant's security office.

Second, the *Cavin* court recognized that although it was not faced with such a situation, a situation could arise, such as here, in which "there may be a question of whether or not an employee gave notice to his *employer*." *Cavin*, 346 F.3d at 725 (emphasis in original). Unlike in *Cavin*, it is undisputed that the security guards working at the Milan Plant were not Visteon employees, but independent contractors. Visteon explicitly prohibited its employees from requesting FMLA through security, in part, because the security guards working at the Milan Plant were independent contractors who were given no FMLA training. Clearly then, Walton never informed his *employer* of the reason for his absence until after his employment had already been terminated. *See Brohm*, 149 F.3d at 523 (noting that an employee who was terminated before he requested relief under the FMLA from his employer could not establish a claim under the statute). And while the *Cavin* court noted that "[e]ven if notice to security did not constitute notice to Honda, we would conclude that Honda had actual notice of Cavin's potential need for leave" because Cavin's supervisor had actual knowledge of his condition, *Cavin*, 346 F.3d at 725 n.8, Walton's supervisor had no actual knowledge of the seriousness of his condition.

In sum, if the key question is whether the employee has given his employer sufficient information for the employer to reasonably conclude that an event described in the FMLA has occurred–as we believe it is and as *Cavin* concedes–then the answer here must be that Walton did

not. This case is distinguishable from *Cavin* on its facts because, unlike the plaintiff in *Cavin*, Walton never explained the extent of the problem for which he was missing work, but instead merely said he had been told to stay off work. Moreover, not only did Walton not comply with Visteon's requirements for reporting the need for FMLA leave, he did exactly what the company required that he *not* do: he called security to request FMLA leave. Security at Visteon's Milan Plant was not the employer, but an independent contractor. And there is no evidence that the employer, Visteon, ever received actual notice that Walton's knee problem was a "qualifying reason for requesting the leave," *Brohm*, 149 F.3d at 523, i.e., there is no evidence that the employer had notice that Walton's problem was a "serious health condition" as defined in 29 U.S.C. § 2611(11) and referenced in 29 U.S.C. § 2612(a)(1)(D).

### III.

For the foregoing reasons, we **AFFIRM** the judgment of the district court granting summary judgment in favor of Visteon on Walton's FMLA-interference claim.