NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0912n.06
Filed: December 20, 2006

Case No. 05-3450

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DENNIS D. McCAUGHEY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| GARLYN SHELTON, INC., d/b/a Garlyn | ) | DISTRICT OF OHIO |
| Shelton Imports, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: BATCHELDER and McKEAGUE, Circuit Judges; and ACKERMAN,* District Judge.

**ALICE M. BATCHELDER, Circuit Judge.** Dennis McCaughey appeals the district court's order granting summary judgment to the defendant, Garlyn Shelton, Inc., in this diversity action for conversion of an automobile McCaughey purchased over the internet from a Texas automobile dealer. Because we conclude that the district court erred in its application of Texas and Ohio law, we reverse the judgment and remand the case for proceedings consistent with this opinion.

**I. Background**

In January 2002, Garlyn Shelton, Inc. (GSI), a dealer doing business in Texas as Garlyn Shelton Imports, delivered possession of a 2002 BMW automobile to Jayson White, a dealer doing

_____

*The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

business in Texas as Millennium Auto Leasing, and on January 29, 2002, caused the Texas Department of Transportation to issue a certificate of title to Millennium, in Millennium's name. On February 7, 2002, Millennium sold the car to Roan Kubas, a dealer doing business in Texas as R.K. Investments, Inc. (R.K.). Millennium endorsed the certificate of title and delivered possession of both the car and the certificate to R.K. On February 14, 2002, R.K. sold the car over the internet to a consumer, Dennis McCaughey, an Ohio resident, for $72,000. R.K. endorsed the certificate of title and shipped both the car and the certificate to McCaughey in Ohio. R.K. sent the endorsed title by Federal Express and McCaughey received it the next day. The car arrived in Ohio on February 18, 2002. McCaughey never applied for or obtained a certificate of title in his own name, in either Texas or Ohio.[1] Therefore, the only existing certificate of title was issued by the Texas Department of Transportation, listed GSI as the "previous owner" and Millennium as the "owner" on the front side, and endorsements from Millennium to R.K. and R.K. to McCaughey on the back side.

Meanwhile, on February 10, 2002, GSI discovered that Millennium's bank draft had been dishonored due to insufficient funds. Upon discovery that the draft had been dishonored, GSI reported the car stolen and the police listed it on the National Crime Information Center (NCIC) database. The next day, acting on a petition by GSI, the Bell County (Texas) District Court issued a writ of sequestration that authorized GSI to take possession of the car from Millennium until such time as Millennium filed a replevy bond or dissolved the writ by court order. By this time, Millennium no longer had possession of the car, having already sold it to R.K.; Millennium therefore took no such action. In April 2002, the Blue Ash (Ohio) Police discovered from the NCIC database

---

[1]McCaughey explained that he intended to assign the title to EDS Federal Credit Union (Plano, Texas), the institution that had financed his purchase of the car, and eventually to register and license the car in Florida.

that the car had been reported stolen, impounded the car, and later released it to a towing company to return it to GSI in Texas. McCaughey filed this action against R.K and Roan Kubas for fraud, breach of warranty, and violation of the Ohio Consumer Sales Practices Act, and against GSI for conversion. GSI and McCaughey filed cross-motions for summary judgment, and the district court eventually entered a final judgment granting GSI's motion and denying McCaughey's, and dismissing R.K. and Kubas without prejudice. McCaughey timely appealed the denial of his motion for summary judgment on the conversion claim, and that is the only matter before us in this appeal.

## II. Standard of Review

We review *de novo* a district court's order granting or denying summary judgment. *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005). Summary judgment is appropriate if there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Here, the facts underlying the action are not in dispute.

## III. Choice of Law

Ohio law governs the conversion claim because the alleged conversion occurred in Ohio. *See Muncie Power Prods., Inc. v. United Techs. Auto., Ins.*, 328 F.3d 870, 873 (6th Cir. 2003); *Morgan v. Biro Mfg.*, 474 N.E.2d 286, 288-89 (Ohio 1984) ("the law of the place of the [tort] injury controls unless another jurisdiction has a more significant relationship to the lawsuit"). However, Ohio law does not control the parties' ownership rights in the car. "[T]he law of the state in which the chattel is located at the time of the transaction in question determines the creation and transfer of interests in the chattel." *State ex rel. Hertz Corp. v. Rice*, 235 N.E.2d 721, 722 (Ohio 1968). Furthermore, the Ohio Supreme Court has adopted the Restatement (Second) of Conflict of Laws

3

§ 188, which applies the law of the state with "the most significant relationship to the transaction and the parties." *Ohayon v. Safeco Ins. Co.*, 747 N.E.2d 206, 209 (Ohio 2001); *see also* Ohio Rev. Code Ann. § 1301.05(A). The Ohio Supreme Court has also recognized certain factors to aid in the decision: "the place of contracting, the place of negotiation, the place of performance, the location of the subject matter, and the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Id*.

The transaction in this case occurred while the car was still in Texas. The sale was completed over the internet while the car was physically located in Texas. McCaughey obtained financing from a Texas credit union and granted that credit union a security interest in the car. R.K. endorsed the title in Texas and sent it to McCaughey by Federal Express, and the record reflects that it arrived in Ohio at least three days before the car arrived. McCaughey did not intend to register or license the car in Ohio, but to remove it to Florida. Hence, at the time of negotiation and contract formation, the car was located in Texas. None of the other factors is persuasive and the Ohio Supreme Court has explicitly held that:

> [The Ohio] Certificate of Motor Vehicle Title Act[] does not abrogate the rule that the law of the state in which a chattel is located at the time of the transaction in question determines the creation and transfer of interests in the chattel, and an interest in a motor vehicle thus created in a foreign state will be recognized in this state, to which the motor vehicle is subsequently removed, even though by the law of Ohio such interest may be defeated by a subsequent transaction therein.

*Hardware Mut. Cas. Co. v. Gall*, 240 N.E.2d 502, 502-03 (Ohio 1968).

Finally, under Ohio tax law, Ohio Rev. Code Ann. § 5739.01, "all sales are presumed to occur at the vendor's location." *CNG Dev. Co. v. Limbach*, 584 N.E.2d 1180, 1182 (Ohio 1992). Both the vendor and the car were located in Texas at the time of the sale. Because the sale occurred

4

in Texas, Texas law determines the competing parties' ownership rights to the car.

## IV. Texas Law

### A. Dealer to Dealer Transactions

Pursuant to the Texas Certificate of Title Act and associated case law, Texas does not require an automobile dealer who sells a car to another dealer to obtain a certificate of title from the State in the name of the purchasing dealer. That requirement applies only to a dealer who sells a new or used car to a consumer, and the sales from GSI to Millenium and from Millenium to R.K. complied with the Act. As for a purchasing dealer: "a dealer perfects legal title to a vehicle if he holds an executed assignment of title, even though the dealer is not shown as the first 'registered' owner on a certificate of title." *State v. Southwind Auto Sales*, 951 S.W.2d 849, 852 (Tex. App. 1997).

Texas Transportation Code § 501.0234(a)(1) applies only to sales of automobiles by dealers to consumers; it does not apply to sales by dealers to dealers. It provides:

> A person who sells at the first or a subsequent sale a motor vehicle and who holds a general distinguishing number issued under Chapter 503 of this code or Chapter 2301, Occupations Code, shall:
>
> (1) . . . apply, in the name of the purchaser of the vehicle, for the registration of the vehicle, if the vehicle is to be registered, and a certificate of title for the vehicle . . . and at the same time
>
> (2) remit any required motor vehicle sales tax.

Tex. Transp. Code Ann. § 501.0234(a).

The language of the first sentence is in the conjunctive: a "person who sells at the first or a subsequent sale . . . *and* who holds a general distinguishing number issued under Chapter 503 of this code or Chapter 2301, Occupations Code." Under Texas law, general distinguishing numbers are issued to vehicle dealers, i.e., persons engaged in the business of selling at least five cars per year.

5

*See* Tex. Transp. Code Ann. § 503.0231, 503.029(a)(6), 503.001(4), and Tex. Occ. Code § 2301.255.

Hence, this code section applies to dealers who sell at the first or subsequent sale.

"First sale" has two distinct components: (1) the sale of a car that has never been registered/licensed (2) to an owner who will register/license it for use:

> 'First sale' means: (A) the bargain, sale, transfer, or delivery of a motor vehicle that has not been previously registered or licensed, with intent to pass an interest in the motor vehicle, other than a lien, regardless of where the bargain, sale, transfer, or delivery occurred; and (B) the registration or licensing of that vehicle.

Tex. Transp. Code Ann. § 501.002(5). Although the precise statutory definition of "first sale" has changed somewhat over the years, Texas courts have consistently interpreted the term as the Texas Supreme Court did in *Motor Inv. Co. v. Knox City*, 174 S.W.2d 482, 485-86 (Tex. 1943):

> [E]very transfer of a motor vehicle, regardless of the number thereof, from manufacturer to dealer, dealer to dealer, and from dealer to 'owner,' as defined in the Act, [collectively] constitutes a 'first sale,' and [] it is not necessary that the vehicle be registered and a certificate of title thereto obtained as a condition precedent to the validity of such 'first sale.'

*Motor Inv. Co.* was cited with approval in *Associates Discount Corp. v. Rattan Chevrolet, Inc.*, 462 S.W.2d 546, 550 (Tex. 1970) ("The sale of [a new, unregistered] vehicle from manufacturer to dealer, and from dealer to 'owner,' as defined in the Act, is a 'first sale,' and the transfer of the manufacturer's certificate is not essential to the validity of the sale."), which in turn was cited with approval in *Bruckner Truck Sales, Inc. v. Farm Credit Leasing Services Corp.*, 909 S.W.2d 75, 80-81 (Tex. App. 1995). And in *Bruckner*, the court specifically noted that the statutory definition of "first sale" included the requirement of registration or licensing of the vehicle "in recognition of the situation where the first sale of a new car was to an owner." *Id.* Finally, the Act defines "owner" as "includ[ing] a person, other than a manufacturer, importer, distributor, or dealer, claiming title

6

to or having a right to operate under a lien a motor vehicle that has been subject to a first sale." Tex. Transp. Code Ann. § 501.002(16).

Like a "first sale," a "subsequent sale" under the Act also has two components: (1) the sale by an owner of a vehicle that has already been registered/licensed (2) to an owner who will obtain new registration/licensing for use. *See* Tex. Transp. Code Ann. §§ 501.002(20)(A) & (B); 501.022(a); 501.071(a) & (b). When these sections of the Act are read together and with the decisions of the Texas courts applying them, it is clear that a dealer – as GSI, Millennium, and R.K. indisputably were – who sells a new vehicle – as the car in this case indisputably was – to another dealer is not required to obtain a registration and certificate of title in the name of the purchasing dealer in order for the sale to be valid. Therefore, we hold that the sales of the car from GSI to Millennium and from Millenium to R.K. were in compliance with the Act.

*B. Good Faith Purchasers*

Where payment for a vehicle is dishonored for insufficient funds (and even in the case of a theft by a fraudulent check) the title is rendered voidable, but not void. *Perry v. Breland*, 16 S.W.3d 182, 190 (Tex. App. 2000). GSI did not discover the insufficient funds until February 10, 2002. On February 7, 2002, Millennium had good title – albeit perhaps voidable – to convey to R.K. *See id*. Because R.K. gave value and obtained possession of both the car and the endorsed certificate of title before the bank drafts were dishonored, R.K. is a good faith purchaser. *See Prestige Ford Garland Ltd. P'ship v. Dallas Postal Credit Union*, No. 05-01-005600CV, 2002 WL 188479, at *4 (Tex. App. - Dallas, Feb. 7, 2002).

As between an innocent seller who endorses title over to the thief and an innocent buyer who unknowingly pays the thief for facially valid title, Texas case law leans heavily toward the possessor

7

of the physical certificate of title, and in this case favors the buyer, R.K. *Compare Bruckner*, 909 S.W.2d 75, *with Gallas v. Car Biz, Inc.*, 914 S.W.2d 592 (Tex. App. 1995). *See also* John Krahmer, *Commercial Transactions, Annual Survey of Texas Law*, 50 SMU L.Rev. 1025, 1034-35 (1997). Therefore, as between GSI and R.K., it is R.K. that had rightful ownership of the car. GSI's cause of action was against Millennium for damages. *See Gallas*, 914 S.W.2d at 592-93 (citing *Drake Ins. Co. v. King*, 606 S.W.2d 812, 818 (Tex. 1980)).

     *C. Dealer to Consumer Transactions*

     A dealer who sells a new car to a consumer must apply to the county assessor designated by the consumer for registration and a certificate of title in the name of the consumer. Tex. Transp. Code Ann. § 501.0234(a)(1)&(2), (d) and (e). However, R.K. did not apply to the county assessor to obtain a certificate of title in McCaughey's name. Instead, R.K. endorsed the certificate of title already in its possession (still in Millennium's name) and sent it to McCaughey, along with the car. It is thus apparent that R.K. failed to comply with the Act's requirements, calling into question the validity of the title R.K. conveyed to McCaughey. However, "[e]ach duty imposed by this section [501.0234] on the seller of a motor vehicle is solely that of the seller." Tex. Transp. Code Ann. § 501.0234(c). Cases involving purchasers who failed to ensure that the seller actually had good title under the Act are not instructive in the present case where the seller had good title and the noncompliance is solely between the two parties to the transaction. *See*, *e.g.*, *Hitt v. Baker*, No. 05-95-01647-CV, 1997 WL 476331 (Tex. App.-Dallas, Aug. 21, 1997); *Drake Ins.*, 606 S.W.2d at 817.

     "Notwithstanding compliance with this chapter, equitable title to a vehicle passes to the purchaser of the vehicle at the time the vehicle is the subject of a sale that is enforceable by either party." Tex. Transp. Code Ann. § 501.0234(f). Although this statute uses the phrase "compliance

8

with this chapter," the meaning is clear: equitable title passes to the purchaser regardless of compliance or noncompliance. *See Perry*, 16 S.W.3d at 187 (holding the sale valid "as between the original parties," despite noncompliance with the Act). Hence, R.K.'s failure to apply for a certificate of title did not necessarily invalidate the conveyance. Moreover, it is doubtful that McCaughey even wanted a Texas certificate of title, beyond that endorsed over to him, or that he would have been motivated to direct R.K. to a Texas county in which he wanted R.K. to apply. *See* Tex. Transp. Code Ann. § 501.0234(d)&(e).

### D. Violation and Voidability

Under the strict language of the statute, "[a] sale made in violation of this chapter is void and title may not pass until the requirements of this chapter are satisfied." Tex. Transp. Code Ann. § 501.073. "However, non-compliance with the Act does not override a clear showing of valid and complete transfer of ownership." *First Nat'l Bank v. Buss*, 143 S.W.3d 915, 919 (Tex. App. 2004). McCaughey paid value, obtained possession of the car, and obtained possession of the certificate of title endorsed over to him. R.K. had good title and endorsed that title over to McCaughey. McCaughey, had he chosen to, could have voided the sale because of R.K.'s failure to obtain and provide him with a certificate of title issued in his name as required by the Act, but R.K. could not void the sale to McCaughey based solely on its own failure to comply with the Act. *See* Tex. Transp. Code Ann. § 501.0234(f); *First Nat'l*, 143 S.W.3d at 919; *Perry*, 16 S.W.3d at 187. This is the type of clear showing of a valid and complete transfer of ownership that even non-compliance will not undo. *First Nat'l*, 143 S.W.3d at 919. Of course, R.K. has made no claim of ownership and this portion of the analysis merely demonstrates that because R.K.'s ownership interest extinguished GSI's, and McCaughey's interest defeats R.K.'s, then under Texas law McCaughey's interest must

9

be superior to GSI's. As explained above, Texas law determines McCaughey's ownership rights to the car, and therefore, under the foregoing analysis, McCaughey is the legal owner.

### V. Ohio Law

*A. Ownership - Ohio Certificate of Title Act*

As we have already demonstrated, Texas law controls the ownership determination and therefore McCaughey owns the car. However, even if the Ohio Certificate of Title Act controlled, McCaughey would have equitable ownership of the car. In Ohio, "a change in ownership of an automobile is not consummated until a certificate of title is issued in the name of the purchaser." *Brewer v. Decant*, 149 N.E.2d 166, 166 (Ohio 1958); *see also* Ohio Rev. Code Ann. § 4505.03 & 4505.04(A).[2] The *Brewer* court explained:

> It is conceded that a certificate of title to the automobile involved herein had not been issued to [the buyer, who was nevertheless in possession of the car]. The automobile remained in the custody and control of [the seller], and, until such time as [the seller] saw fit to have a certificate issued to [the buyer], the automobile was being used by [the buyer] with [the seller's] permission.

*Brewer*, 149 N.E.2d at 169. Applying that explanation to the present case, R.K. would continue to own the car (retain legal custody and right to control) until such time as McCaughey obtained an Ohio certificate of title, and until that time McCaughey would merely be using the car with R.K.'s permission. So, under *Brewer*, McCaughey would not "own" the car; R.K. would own the car. But R.K. could not obtain an Ohio Certificate of Title in its own name, because it had conveyed to

---

[2]Two Ohio Supreme Court cases warrant mention, but are distinguishable. In *Saturn of Kings Automall, Inc. v. Mike Albert Leasing, Inc.*, 751 N.E.2d 1019, 1025 (Ohio 2001), the seller did not assign or deliver the certificates of title to the buyer, so the buyer not only failed to obtain a title issued in his name, but failed to obtain physical possession of any certificate at all. In *Allan Nott Enterprises, Inc. v. Nicholas Starr Auto, LLC*, 851 N.E.2d 479, 486 (Ohio 2006), the seller was a thief, so the buyer not only failed to obtain a title issued in his name, but failed to obtain good title at all because in Ohio a thief cannot convey valid title even to a bona fide purchaser without notice. In the present case, McCaughey obtained possession of a facially valid certificate of title from R.K., who was not the thief, and instead, did have good title under Texas law.

McCaughey the only legal title in existence. *See* Ohio Rev. Code Ann. § 4505.06(A)(3) (requiring an applicant for an Ohio certificate of title to present "a certificate of title of another state from which the motor vehicle was brought into this state"). Therefore, *Brewer* does not resolve this case, but merely results in no one's being able to assert legal ownership as a matter of Ohio title law.

Based on the foregoing, if we were to apply Ohio law to this ownership question, we would conclude that McCaughey has equitable ownership of the car. The Ohio Supreme Court's alternative rule fits just such an approach. "[W]here endorsement and delivery of a certificate of title for an automobile are made, title passes even though there is a failure on the part of the recipient to secure the issuance of a new certificate in his name." *Garlick v. McFarland*, 113 N.E.2d 92, 93 (Ohio 1953), *called into doubt by Brewer*, 149 N.E.2d at 169. As a matter of equity, "[w]hen one of two innocent persons must suffer from the fraud of a third, the one who made it possible for the fraud to be perpetrated must bear the loss." *Hardware Mut. Cas. Co. v. Gall*, 240 N.E.2d 502, 502-03 (Ohio 1968); *see also Saturn of Kings Automall, Inc. v. Mike Albert Leasing, Inc.*, 751 N.E.2d 1019, 1026 (Ohio 2001) (Cook, J., dissenting). In the present case, GSI obtained title in the name of the thief – Millenium – and conveyed that title to the thief before ensuring that it would be able to collect on the bank drafts. McCaughey, on the other hand, obtained facially valid title from a Texas bona fide purchaser holding good title. As between these two parties it was GSI that was in the best position to prevent the harm caused by Millennium – be it fraud or mistake – and therefore GSI should bear the loss.

*B. Conversion*

Under Ohio law, conversion is "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent

11

with his rights." *Joyce v. Gen. Motors Corp.*, 551 N.E.2d 172, 175 (Ohio 1990). As this definition uses the particular word "owner," but does not specify whether ownership must be legal or merely equitable, it is worth noting that an alternative definition has been quoted by almost every district level appellate court in Ohio: "any exercise of dominion or control wrongfully exerted over the personal property of another." *See, e.g., Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.*, 493 N.E.2d 289, 292 (Ohio App. 1985); *Cruz v. S. Dayton Urological Assoc., Inc.*, 700 N.E.2d 675, 681-82 (Ohio App. 1997); *Saydell v. Geppetto's Pizza & Ribs Franchise Sys., Inc.*, 652 N.E.2d 218, 227 (Ohio App. 1994); *Wozniak v. Wozniak*, 629 N.E.2d 500, 508 (Ohio App. 1993).

Under either definition, an Ohio "[p]laintiff need not possess absolute ownership of the property in order to maintain an action for its conversion. It is generally sufficient if [the] plaintiff possesses some interest in the property and has possession or immediate right to possession." *Preston Trucking Co., Inc. Frontier Div. v. Lindamood*, No. CA86-12-076, 1987 WL 18758, at *2 (Ohio App. Oct. 19, 1987) (certain citations omitted) (citing *Schaeffer v. Marienthal, Lehman & Co.*, 17 Ohio St. 183 (1867)); *see also Willis v. New Horizon Builders, Inc.*, No. CA98-02-014, 1998 WL 761646, at *2 (Ohio App. Nov. 02, 1998) ("The test is whether appellants' actions were inconsistent with appellee's rights as a possessor and licensee of the software package."). "In determining whether a plaintiff has a sufficient title or a right to possess the converted property to satisfy this requirement, courts have permitted bringing an action for conversion by such persons as the equitable owner of the property . . . ." 18 Ohio Jur.3d Conversion and Replevin § 14 (2006) (citing *Keys v. Pittsburg & W. Coal Co.*, 50 N.E. 911 (1898)).

We conclude that it is not necessary to determine whether McCaughey had legal title to the vehicle or merely equitable title. His ownership interest was clearly sufficient to support his

12

conversion claim against GSI.

## VI. Conclusion

As we have explained herein, Texas law governs the issue of ownership of this vehicle, and Ohio law governs the conversion issue. Under Texas law, McCaughey had legal title to the vehicle, but even if we were to apply Ohio law to determine ownership, in which case his interest in this vehicle was merely equitable or possessory, that interest was sufficient to support a *prima facie* case of conversion under Ohio law. Accordingly, we REVERSE the district court's grant of summary judgment to GSI on the conversion claim and REMAND the case for further proceedings consistent with this opinion.