## NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0266n.06

Case No. 14-1789

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| PAUL MENDEL, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Apr 14, 2015 |
| | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| CITY OF GIBRALTAR, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | OPINION |

BEFORE: CLAY, KETHLEDGE, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Plaintiff Paul Mendel brought an action under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654, against his former employer, the City of Gibraltar, after it terminated his employment as a police dispatcher in February of 2009. The district court granted summary judgment to Gibraltar. *Mendel v. City of Gibraltar*, No. 11-10496, 2014 WL 2558218 (E.D. Mich. June 6, 2014). Citing *Edgar v. JAC Products, Inc.*, 443 F.3d 501 (6th Cir. 2006), the district court concluded that Mendel was not entitled to relief because the earliest day he could return to work following medical clearance well-eclipsed the 12-week period of leave provided by the FMLA. Mendel appeals, arguing that the district court erred (1) by assessing full weeks of utilized leave, rather than intermittent leave pursuant to 29 C.F.R. § 825.205(b)(1); and (2) by assessing utilized leave

even for weeks in which Gibraltar had removed Mendel from the dispatcher schedule entirely. For the reasons stated below, we **AFFIRM** the district court's grant of summary judgment to Gibraltar.

I.

A.

The relevant facts in this case are largely undisputed. Mendel began work as a police dispatcher for Gibraltar in 2004. Beginning in 2007, he also worked as a dispatcher for the City of Trenton. Gibraltar dispatchers do not work fixed schedules; rather, the Chief of Police sets the dispatcher schedule based on employee preferences and availability approximately one month in advance. Some dispatchers work several days per week, while others work significantly fewer days. In 2008, Mendel worked a total of 1,862 hours—an average of 35.8 hours per week.

In the autumn of 2008, Mendel began to experience severe and constant abdominal pain. He did not work his scheduled shifts at Gibraltar from October 2-5, 2008. On October 15, 2008, Mendel underwent surgery in order to eliminate scar tissue resulting from a previous hernia-related surgery. The October surgery did not alleviate Mendel's abdominal-pain issue.

In December of 2008, Mendel's abdominal pain intensified and incapacitated him from working. The pain spread from Mendel's abdomen into his groin, lower back, and hip. At his deposition, Mendel described the pain as so severe that, at times, he "couldn't get out of bed for three, four days" and "couldn't even bend over to get dressed." Mendel missed eight consecutive shifts in December of 2008. On December 22, 2008, Gibraltar Chief of Police Ray Canterbury sent Mendel a letter requesting a doctor's certificate of illness by the next day. The letter indicated that failure to submit such a certificate would result in termination of Mendel's employment as a Gibraltar dispatcher. Mendel submitted a note from Dr. John C. Baumann

indicating that Mendel had been in Dr. Baumann's care since December 12, 2008, and that Mendel would be able to return to work on January 2, 2009.

Due to his chronic pain, however, Mendel was unable to work and missed all of his scheduled Gibraltar shifts in January of 2009. During this time, Mendel alerted Trenton about his ongoing medical issues and declined to submit his availability for work until he was ready to return. As a result, he did not appear on the Trenton dispatcher schedule after December of 2008. Mendel never requested removal from the Gibraltar schedule. As a result of his missed shifts in January, Chief Canterbury removed Mendel from the Gibraltar dispatcher schedule until January 26, 2009. In a meeting in mid-January, Mendel told Chief Canterbury that he thought he would be able to return to the February 2009 schedule.

However, Mendel also missed all of his scheduled Gibraltar shifts in February of 2009. On February 13, 2009, Chief Canterbury sent Mendel another letter requesting a doctor's certificate of illness by February 16, 2009, and indicating that the penalty for non-receipt would be termination. Chief Canterbury also removed Mendel from the February and March 2009 schedules.

On February 20, 2009, Mendel's wife delivered a note from Dr. Lael A. Stone of the Cleveland Clinic to the Gibraltar Police Department. The note indicated that Mendel had been visiting the Cleveland Clinic "intermittently since the first week in January" and that "several more visits over the next month" would be necessary. The note stated that Mendel "should remain off work pending further testing."

On February 23, 2009, Chief Canterbury sent Mendel another letter. The letter noted that Mendel's letter from Dr. Stone was late and "[did] not indicate that [Mendel was] in the clinic or under a doctor's care on February 7th, 8th, 11th, 12th, or the 13th"—the dates on which Mendel

was scheduled to work in February of 2009. Chief Canterbury's letter further stated: "After not receiving the required Certificate of Illness by February 16, 2009, it is my belief that you have voluntarily terminated your employment as a dispatcher with the City of Gibraltar." Thereafter, Mendel no longer appeared on the Gibraltar dispatcher schedules.

At his deposition, Mendel testified that he was unable to work from December 12, 2008, until at least May of 2009, when surgery alleviated his chronic-pain issue. Ultimately, doctors did not clear Mendel to work until June 1, 2009. He returned to work at Trenton in June of 2009.

B.

Mendel filed his FMLA complaint against Gibraltar in the United States District Court for the Eastern District of Michigan on February 7, 2011. On September 20, 2011, Gibraltar moved for summary judgment, arguing that because the City did not employ more than 50 employees, Mendel was not an "eligible employee" under the FMLA. *See* 29 U.S.C. § 2611(2)(B)(ii). Specifically, Gibraltar argued that its volunteer firefighters should not count toward its total number of employees under the relevant statutory definitions because, inter alia, they receive only a nominal stipend and are not required to respond to emergency calls. *See id.* § 2611(3); *id.* § 203(e), (g). The district court agreed and, on January 31, 2012, granted summary judgment to Gibraltar. *Mendel v. City of Gibraltar*, 842 F. Supp. 2d 1035, 1044 (E.D. Mich. 2012).

On August 15, 2013, a divided panel of this Court reversed and remanded the case. *Mendel v. City of Gibraltar*, 727 F.3d 565, 572 (6th Cir. 2013). The majority held that "the substantial wages paid to [Gibraltar's] firefighters constitute compensation, not nominal fees, which makes the Gibraltar firefighters employees, not volunteers, for purposes of the FLSA and

FMLA."[1]  *Id.* (footnote omitted).  Notably, and unlike in the current appeal, the facts in the prior appeal "[did] not concern Mendel or the story surrounding his termination."  *Id.* at 567.

Following remand, on February 14, 2014, Gibraltar again moved for summary judgment. This time, Gibraltar argued that Mendel could not establish an FMLA violation because the indisputable facts showed that he was unable to work for over six months—far longer than the 12-week period contemplated by the FMLA.  Gibraltar also moved for sanctions under Federal Rule of Civil Procedure 11.

On June 6, 2014, the district court agreed with Gibraltar's summary judgment argument. Citing *Edgar*, 443 F.3d at 510, the court noted that "a plaintiff cannot recover under the FMLA even if he is terminated before the remaining FMLA-leave expires, if he could not return to work prior to week twelve," and that "terminating an employee does not toll FMLA weeks."  *Mendel*, 2014 WL 2558218, at *3, *4.  The court further reasoned that, based on Mendel's own admissions, Mendel was unable to work for two months straight beginning on January 1, 2009,[2] and could not work during the fifteen weeks between his termination in February and his return to the workforce on June 1, 2009.  *Id.* at *4-5.  Assuming for calculation purposes that Mendel would have worked a full-time schedule based on his average of 35.8 hours worked per week in 2008, *see* 29 C.F.R. § 825.205(b)(3),[3] the court held that "Mendel's injury exceeded the statutory

---

[1]The dissent took issue with the majority's characterization of the firefighters' fees as "substantial wages," noting that, when unpaid training is taken into account, "a McDonald's employee receives more than these public servants do."  *Mendel*, 727 F.3d at 573 (Kethledge, J., dissenting).  The dissent also emphasized that Gibraltar's firefighters were not required to respond to emergencies—"[i]ndeed a firefighter could go for years without responding to a single fire—and the City would not discipline him."  *Id.*

[2]The court determined that, pursuant to 29 C.F.R. § 825.200(b) and (e), the beginning of the calendar year—January 1, 2009—was the date on which the 12-month period for FMLA-leave entitlement should begin to run because it "provide[d] the most beneficial outcome" to Mendel.  *Mendel*, 2014 WL 2558218, at *3.

[3]29 C.F.R. § 825.205(b)(3) provides:

> If an employee's schedule varies from week to week to such an extent that an employer is unable
> to determine with any certainty how many hours the employee would otherwise have worked (but
> for the taking of FMLA leave), a weekly average of the hours scheduled over the 12 months prior

framework." *Id.* at *5. In doing so, the court rejected Mendel's argument that it should have calculated his utilized leave on a pro rata or proportional basis pursuant to 29 C.F.R. § 825.205(b)(1)[4] because he was a part-time employee taking leave intermittently. *Id.* at *3. The court emphasized that "a part-time employee who misses his entire scheduled work week," as Mendel did, "uses a full FMLA week." *Id.* at *4. The district court declined to assess Rule 11 sanctions against Mendel. *Id.* at *5.

Mendel timely appealed. Gibraltar did not appeal the district court's denial of Rule 11 sanctions.

II.

We review a district court's order granting summary judgment *de novo*. *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 613 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, we must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Edgar*, 443 F.3d at 506 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

---

to the beginning of the leave period (including any hours for which the employee took leave of any type) would be used for calculating the employee's leave entitlement.

[4]29 C.F.R. § 825.205(b)(1) provides:

Where an employee works a part-time schedule or variable hours, the amount of FMLA leave that an employee uses is determined on a pro rata or proportional basis. If an employee who would otherwise work 30 hours per week, but works only 20 hours a week under a reduced leave schedule, the employee's 10 hours of leave would constitute one-third ($^1/_3$) of a week of FMLA leave for each week the employee works the reduced leave schedule. An employer may convert these fractions to their hourly equivalent so long as the conversion equitably reflects the employee's total normally scheduled hours. An employee does not accrue FMLA-protected leave at any particular hourly rate.

The FMLA entitles "eligible employee[s] . . . to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "Once the 12-week period ends, however, employees who remain 'unable to perform an essential function of the position because of a physical or mental condition . . . [have] no right to restoration to another position under the FMLA.'" *Edgar*, 443 F.3d at 506 (alteration in original) (quoting 29 C.F.R. § 825.216(c)). In his complaint, Mendel asserts that Gibraltar interfered with his FMLA-leave rights by terminating his employment. To prevail on such a claim, he must prove that:

> (1) [he] was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) [he] was entitled to leave under the FMLA, (4) [he] gave the employer notice of [his] intention to take leave, and (5) the employer denied the employee FMLA benefits to which [he] was entitled.

*Id.* at 507 (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)). In this appeal, the parties dispute only the fifth factor.

Mendel's primary argument on appeal is that the district court erred by assessing full weeks of utilized leave beginning on January 1, 2009,[5] rather than partial weeks under the intermittent-leave regulations, 29 C.F.R. § 825.205(b)(1). He maintains the position he asserted before the district court—i.e., that because he only took off fractions of a week at a time, he should only be charged for the partial weeks he took off in January and February of 2009. According to Mendel, the appropriate calculation of utilized leave amounts to 2.4 weeks, broken down as follows:

| | | |
|---|---|---|
| January 1-5, 2009 | 3 days | 0.6 week |
| January 6-12, 2009 | 1 day | 0.2 week |
| January 13-19, 2009 | 0 | 0 week |

---

[5]Mendel concedes that January 1, 2009, is the appropriate start date for purposes of calculating his utilized leave.

| | | |
|---|---|---|
| January 20-26, 2009 | 1 | 0.2 week |
| January 27-February 2, 2009 | 2 | 0.4 week |
| February 3-9, 2009 | 2 | 0.4 week |
| February 10-16, 2009 | 3 | 0.6 week |
| (February 17-June 1, 2009) | 0 | 0 week |

*Mendel*, 2014 WL 2558218, at *3. We reject Mendel's argument.

Simply put, Mendel did not take leave on an intermittent basis. Rather, as the district court noted, he "missed every day he was scheduled to work for two months straight from January 1, 2009." *Id.* at *4. Further, as Mendel has conceded, he was not able to work at all between January 1, 2009, and June 1, 2009. The regulations implementing the FMLA define intermittent leave as "leave taken in separate periods of time due to a single illness or injury, rather than for one continuous period of time." 29 C.F.R. § 825.102; *see also Hoffman v. Prof'l Med Team*, 394 F.3d 414, 418 (6th Cir. 2005) (noting that intermittent leave is "taken in separate periods of time" rather than in "one block of leave of twelve weeks or fewer"). The clear import of the regulation and the examples it provides is that intermittent leave applies to employees who continue to work reduced workweeks. *See* 29 C.F.R. § 825.205(b)(1) ("If an employee who would otherwise work 30 hours per week, but *works* only 20 hours a week under a reduced leave schedule, the employee's 10 hours of leave would constitute one-third ($^1/_3$) of a week of FMLA leave for each week the employee *works* the reduced leave schedule." (emphasis added)); *see also Miller v. Personal-Touch of Va., Inc.*, 342 F. Supp. 2d 499, 512 (E.D. Va. 2004) ("[I]ntermittent leave is designed to be interspersed with periods of work.").

Mendel did not—indeed, could not—continue working during the relevant period. Thus, the intermittent-leave regulations do not govern his situation. *See Mellen v. Trs. of Bos. Univ.*, 504 F.3d 21, 25 (1st Cir. 2007) (noting that the purpose of the intermittent-leave provision "is to ensure that an employer does not claim that an employee who takes off one day during a five-day

work week has taken off the entire week . . . .  Its purpose is not to give an advantage to an employee who takes off five weeks but designates it intermittent leave over an employee who takes off five weeks as continuous FMLA leave.").  Because Mendel missed entire workweeks for which he was scheduled, the district court properly assessed his utilization of "full FMLA week[s]."  *Mendel*, 2014 WL 2558218, at *4.

Mendel also argues, without citation to authority, that the district court erroneously assessed utilized weeks of leave for weeks in which Chief Canterbury had removed Mendel from the dispatcher schedule.  There does appear to be some support for the position that an employer cannot assess FMLA leave against an employee who is otherwise not scheduled to work.  For example, in *Truitt v. Doyon Drilling, Inc.*, a district court considered an FMLA claim by a mechanic who "worked a two weeks on, two weeks off rotation."  764 F. Supp. 2d 1167, 1168 (D. Alaska 2010).  The mechanic suffered medical ailments that sidelined him from work from January to March of 2006, and again from June to October of 2006.  *Id.*  The mechanic's employer declined to reinstate his employment as a mechanic after assessing utilized weeks of leave for the off-weeks in the mechanic's rotational schedule.  *Id.* at 1168-69.  The court, citing the preamble to the final FMLA regulations disseminated by the Department of Labor, ruled in favor of the mechanic, holding that "an employee's FMLA leave time may not be reduced by periods the employee is not scheduled to work."  *Id.* at 1170; *see also* 60 Fed. Reg. 2180, 2203 (Jan. 6, 1995) ("An employee's FMLA leave entitlement may only be reduced for time which the employee would otherwise be required to report for duty, but for the taking of the leave.  If the employee is not scheduled to report for work, the time period involved may not be counted as FMLA leave.").

But *Truitt* is not on all fours with this case. For one, *Truitt* involved an employee who, during his regularly scheduled off-weeks, was not required to report to work regardless of his leave-inducing medical conditions. 764 F. Supp. 2d at 1168. Conversely here, as noted by Gibraltar in its appellate briefing, the only reason Chief Canterbury removed Mendel from the dispatcher schedule was because he did not—and could not—show up for his shifts due to his ongoing condition. Nor was Mendel a rotational employee, as was the mechanic in *Truitt*. *See* 60 Fed. Reg. at 2203 (referencing "employees who work seven days and then are off for seven days"). In that sense, Mendel would be required to show up for work as a Gibraltar dispatcher during the times Chief Canterbury removed him from the schedule "*but for the taking of the leave.*" *Id.* at 2203 (emphasis added).

We are not convinced that the principles set forth in *Truitt* are applicable to the circumstances here. The preamble language relied on by *Truitt* falls within an explanatory paragraph referencing 29 C.F.R. § 825.205—the regulation governing intermittent or reduced leave schedules. *See* 60 Fed. Reg. at 2203; *see also Murphy v. John Christner Trucking, LLC*, No. 11-CV-444-GKF-TLW, 2012 WL 3428072, at *5 (N.D. Okla. Aug. 15, 2012) ("The Federal Register preamble language relied upon by the court in *Truitt* addressed regulations pertaining to intermittent and reduced leave . . . ."). But we already have determined that the leave taken by Mendel cannot be characterized as intermittent leave. Thus, it is not clear that the preamble's language governs continuous blocks of leave, such as the one taken by Mendel, which are enumerated in and governed by 29 U.S.C. § 2612(a) and 29 C.F.R. § 825.200.

In light of the foregoing analysis, we agree with the district court's calculation of Mendel's utilized leave. Mendel concedes that his twelve-week FMLA-leave clock began to run on January 1, 2009. Using full weeks of leave in one continuous block, Mendel's statutory leave

period expired on March 26, 2009. *Mendel*, 2014 WL 2558218, at *3, *5. Doctors did not clear

Mendel to return to work until June 1, 2009, after which he returned to work at Trenton. It does

not matter in this case that Gibraltar terminated Mendel's employment in February of 2009, prior

to the expiration of the statutory leave period. *See Edgar*, 443 F.3d at 506-07 ("[A]n employer

does not violate the FMLA when it fires an employee who is indisputably unable to return to

work at the conclusion of the 12-week period of statutory leave.").[6] Mendel has not "testified

unequivocally that [he] would have returned to work by the end of the leave period if [he] had

known that [his] job[ was] at stake," *id.* at 510, or otherwise pointed to evidence creating a

genuine dispute of fact regarding his ability to return at the expiration of the statutory leave

period, *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 429 (6th Cir. 2014).

He therefore cannot establish a prima facie case that Gibraltar denied him FMLA-leave rights to

which he was entitled. *See Edgar*, 443 F.3d at 508 ("Employees seeking relief under the

entitlement theory must . . . establish that the employer's violation caused them harm."); *Cehrs v.*

*Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 785 (6th Cir. 1998) (holding that the plaintiff

had "failed to raise a genuine issue of material fact concerning her claim under the FMLA"

because she "was clearly unable to return to work within the period provided by the FMLA").

---

[6]Mendel attempts to distinguish *Edgar* from his case by noting that *Edgar* did not involve "a part-time employee who sets his own schedule." Thus, he asserts, the Court cannot presume that he would have placed himself on the dispatcher schedule in March, April, or May of 2009, and that he would thereby require FMLA leave during those months. Even taking all reasonable inferences in Mendel's favor, as we must, the record does not support his contention. Although Chief Canterbury clarified that Gibraltar dispatchers did have input regarding their schedules based on past practices and preferences, he nonetheless testified that he retained the ultimate authority for assigning work schedules. Moreover, the fact that Mendel worked at Gibraltar 35.8 hours per week on average prior to his medical issues undercuts his speculation that he might not have been scheduled at all in March of 2009 and beyond. In fact, Mendel admitted at his deposition that he considered Gibraltar his "main employer" and that he "was just picking up shifts [at Trenton] on [his] off shifts [from] Gibraltar." In any event, as we already have noted, that distinction is irrelevant because Mendel did not take intermittent leave.

III.

For the reasons stated above, we **AFFIRM** the district court's grant of summary judgment to Gibraltar.