**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 09a0134n.06**
**Filed: February 17, 2009**

**No. 07-1792**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DONALD L. BARRETT, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| DETROIT HEADING, LLC, a Michigan limited | ) | |
| liability company, | ) | |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CAROLYN HAMPTON, individually, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

BEFORE: RYAN, SILER, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant-appellant Detroit Heading, LLC, terminated plaintiff-appellee Donald L. Barrett

under its attendance policy because of his absence from work on November 1, 2004. On that date,

Barrett, who had a history of hypertension and was being treated for the disorder, experienced a

"hypertensive urgency." Barrett filed a one-count complaint against Detroit Heading and its vice

president for human resources, Carolyn Hampton, in her individual capacity, in the United States

District Court for the Eastern District of Michigan. He alleged that Detroit Heading and Hampton

violated the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, by unlawfully discharging him for a serious health condition that rendered him unable to perform his job.

A jury returned a verdict in favor of Barrett and against Detroit Heading but found that Hampton was not liable. Thereafter, Detroit Heading filed a motion for judgment as a matter of law, which the court denied. The court entered judgment in Barrett's favor in the amount of $95,970.18, which included $45,000.00 in damages pursuant to the verdict, $46,257.00 in attorney fees, and $4,713.18 in court costs.

Detroit Heading appeals the judgment, the district court's denial of its motion for judgment as a matter of law, and the court's exclusion of its proposed verdict interrogatory that would have required the jury to find whether Barrett provided "complete and truthful information about his condition that enabled [Detroit Heading] to conclude that his November 1, 2004, absence was protected by the FMLA." As grounds for its appeal, Detroit Heading concedes that, although Barrett provided enough information about his medical condition to trigger a duty on its part to make further inquiry about whether his absence on November 1, 2004, qualified for protection under the FMLA, Barrett failed "to cooperate and share full and complete truthful information about his condition" once Detroit Heading allegedly satisfied its duty.

Because the evidence provided a sufficient basis from which a reasonable jury could have found that Barrett provided Detroit Heading with the required notice under the FMLA and that Detroit Heading violated the FMLA when it terminated Barrett, we affirm the district court on those

issues. Further, because the district court did not abuse its discretion in excluding Detroit Heading's proposed interrogatory from the verdict form, we also affirm that decision.

I.

Detroit Heading, LLC, is a manufacturing business that produces bolts, screws, nuts, and fasteners for automobiles. In August 2001, Detroit Heading hired Donald L. Barrett as a "header." A header operates large industrial machines that "stamp out" bolts. The job is physically demanding and requires "a lot of bending, a lot of lifting, [and] a lot of pulling." It was not uncommon for Barrett to "break a sweat . . . for an hour or two at a time" while performing his job.

During the relevant period, Carolyn Hampton was Detroit Heading's vice president of human resources, and Ken Weddington was its plant manager. At trial, Hampton and Weddington described Barrett as an "exceptional employee." He "had a skill that very few people in [the] plant had." Barrett's work product was of "very good quality," and he was "hard-working" and "very respectful" to co-workers and supervisors.

Before Barrett began his employment at Detroit Heading, his physician, Dr. Vincent Maribao, diagnosed him with hypertension, an "abnormal elevation of blood pressure" that causes strokes, heart attacks, organ failure, and death. Barrett's hypertension was of the "labile" variety, meaning that "his [blood] pressure can go up and down at a moment's notice." Dr. Maribao treated Barrett's hypertension with medications and by instructing Barrett to rest when under stress. Barrett took his blood pressure medication as prescribed.

Barrett's wife, Rose, is a certified nursing assistant employed by a local hospital. Her job requires that she take patients' blood pressures approximately fifty times per day, and during the relevant period, she regularly took her husband's blood pressure twice a day.

Before Detroit Heading hired Barrett, it required him, as part of its policy, to undergo a pre-employment physical examination "for the purpose of assisting the employment department in placing [him] in a job that is safe to [himself] and others . . . ." On the questionnaire, Barrett disclosed that he had been treated for "abnormal blood pressure." Although the examining physician recommended that Barrett be employed "without restrictions," the doctor noted that Barrett had a history of hypertension and documented his blood pressure at the time of the examination as 142/98.[1] Detroit Heading placed the examination form in Barrett's personnel file.

On eight different occasions between August 2001 and November 1, 2004, Dr. Maribao signed doctor slips excusing Barrett from work because of "uncontrolled hypertension" or "hypertensive urgency." Five of the notes excused Barrett from work for extended periods of one week, six days, eight days, nine days, and six weeks, and one note limited the number of hours Barrett could work over a four-week period. Three of the notes related to Barrett's hospitalization during the summer of 2003, when he experienced a "hypertensive crisis" resulting from a blood pressure reading of 180/138, accompanied by headache and tingling sensations.

---

[1]A normal blood pressure for an adult of Barrett's age is 120/80.

Hampton or Weddington, or both, dated, initialed, and approved each note and placed them in Barrett's personnel file. Weddington testified at trial that he "knew [Barrett] had high blood pressure" because Barrett told him.

In the summer of 2004, Barrett allegedly visited Hampton's office to inquire about his eligibility for leave under the FMLA. According to his trial testimony, Barrett conveyed to Hampton that he had hypertension and that Detroit Heading's vice president of operations had suggested to him in a previous conversation that he might qualify for leave under the Act. Hampton allegedly responded that "there was a lot involved in getting that together," that "[i]t would take her a little bit of time," and that "she didn't think that [he] would qualify under hypertension for Family Medical Leave Act." Barrett testified that he "dropped it at that" because he "assumed that [Hampton] knew what she was talking about and [he] was ignorant of [the] FMLA . . . ."

Prior to January 2004, Detroit Heading permitted its employees to take unlimited numbers of absences provided that they submitted doctors' notes excusing them from work. Because of the high number of employee absences, however, it implemented a No-Fault Attendance Policy in January 2004. The new policy assessed employees one-half of an occurrence for being tardy by less than one hour and one occurrence for being absent or tardy by more than one hour or leaving work early. Detroit Heading took no disciplinary action until the employee accumulated four occurrences, at which time it gave the employee a verbal warning. Each occurrence thereafter resulted in increasing levels of discipline, including a written warning at five occurrences, a three-day unpaid suspension at six occurrences, and termination at the seventh occurrence. When an employee was

absent because of an emergency, Detroit Heading permitted the worker to use vacation or personal days up to three times per calendar year, provided that vacation and personal days were available and that the worker notified management thirty minutes prior to the start of the employee's shift. The policy excused absences, and therefore did not charge employees occurrences, if such absences resulted from: vacation and personal paid days, holidays, work-related injuries, jury duty, approved bereavement, company-approved seminars or educational classes, or leave granted in accordance with state or federal law. Barrett was aware of the No-Fault Attendance Policy.

Barrett agreed that he had his "share of attendance problems" during his employment at Detroit Heading. He missed work on numerous occasions for reasons related and unrelated to his hypertension. Before his shift on November 1, 2004, Barrett had accumulated six occurrences under the No-Fault Attendance Policy.

On November 1, 2004, Barrett awoke "feeling very ill." His symptoms included a headache, tension in his neck, tingling in his face, blurred vision, and "he couldn't even talk straight." Barrett directed his wife to take his blood pressure. His blood pressure measured 180/110 and qualified as a "hypertensive urgency."

Rose Barrett urged her husband to lie down and take his medication, and she then called Dr. Maribao's office. She spoke to Dr. Maribao's secretary, Rose Hicks, and requested that Hicks inform Dr. Maribao that her husband's blood pressure was "very elevated." Mrs. Barrett also conveyed to Hicks Mr. Barrett's blood pressure reading. Hicks placed Mrs. Barrett on hold, consulted with Dr. Maribao, and pursuant to Dr. Maribao's instructions, instructed Mrs. Barrett that

her husband should "stay in bed, take the medication, and take the day off." Because no appointments were available with Dr. Maribao that day, Mrs. Barrett scheduled an appointment for her husband with the doctor on the following day, November 2, 2004. She then relayed Dr. Maribao's instructions to Mr. Barrett.

Within two minutes of her conversation with Hicks and approximately 45 minutes prior to the start of her husband's shift, Mrs. Barrett contacted Detroit Heading to inform it that her husband would be absent from work that day. She asked to speak to Weddington. Weddington was a proper person to notify of Mr. Barrett's absence. Because Weddington was not available, Mrs. Barrett left a message on his voice mail. Company policy permitted employees' spouses to report absences and to leave voice mail messages explaining the reasons for those absences. In her voice mail message, Mrs. Barrett informed Weddington that "Mr. Barrett won't be in" and that he was "asking for an emergency vacation day because his blood pressure was elevated." She also invited Weddington to return her call if he had any questions.

Weddington returned Rose Barrett's call. He agreed at trial that Mrs. Barrett informed him that "the reason Mr. Barrett couldn't come in was because of his high blood pressure, that it had elevated." Weddington also acknowledged that Mrs. Barrett communicated her husband's blood pressure reading to him. Weddington conceded at trial that he did not ask Mrs. Barrett any questions during the call because she told him everything he wanted to know. Although Rose Barrett pleaded for an emergency vacation day on behalf of her husband, Weddington informed Mrs. Barrett that her husband had already exhausted his emergency vacation days.

At trial, Hampton admitted the following:

Q.      You heard Mr. Weddington's testimony yesterday, correct?

A.      Yes.

Q.      And during his testimony he testified under oath that when Mrs. Barrett left a voice mail message for him on November 1st, 2004 that she told him that her husband, Don, could not come into work that day.  He couldn't come into work because of his blood pressure going up, and that he needed an emergency vacation day.  Do you recall that?

A.      Yes.

Mrs. Barrett stayed home from work on November 1, 2004, to care for her husband.  She monitored Mr. Barrett's blood pressure every fifteen minutes throughout the day as she would have done with a patient under her care whose blood pressure "was elevated that much."  Mr. Barrett slept most of the day on November 1, 2004, and took extra blood pressure medication.

By late afternoon on November 1, 2004, Mr. Barrett's blood pressure dropped to 140/100, which was still an elevated reading.  Although the symptoms Mr. Barrett experienced earlier in the morning were not as severe, they remained.  He continued resting at home because he did not feel well enough to return to work, Dr. Maribao had ordered him to stay home, he still experienced pain and tension in his face and neck, and he did not think it was safe to work.  Dr. Maribao testified that he would not have wanted Mr. Barrett to return to work on November 1, 2004, without evaluating him because the elevated blood pressure can "recur back within a matter of hours, minutes."  There is "no guarantee [the blood pressure level is] going to stay down . . . ."

At trial, Hampton agreed that she "would not fault Mr. Barrett for not coming in and working his job as a header with heavy machinery on . . . November 1st, 2004 after his blood pressure went down . . . ." She conceded that if his blood pressure was 140/100, "it could be a danger to his safety and potentially the safety of other employees . . . ."

On November 2, 2004, before his scheduled shift, Mr. Barrett appeared for his appointment at Dr. Maribao's office. His blood pressure measured 130/90, which was borderline but "fairly good" for him, and Mr. Barrett conveyed to Dr. Maribao that he "felt a lot better today." Although Barrett informed Dr. Maribao that he was still experiencing some of the symptoms he felt the previous day, he rejected Dr. Maribao's suggestion to "take one more day off." Dr. Maribao wrote a slip excusing Mr. Barrett's absence from work on November 1, 2004, noting the diagnosis of "hypertensive urgency."

Barrett testified that while checking out and scheduling his next appointment, Hicks offered to fax the note excusing his absence on November 1, 2004, to his employer. Barrett accepted and waited to confirm that Hicks had sent the fax. Because Hicks faxed excuse slips for Barrett to Hampton on previous occasions, she had Hampton's fax number on file. Hampton acknowledged that she permitted employees to fax medical excuse slips to her fax number, and Barrett testified that he witnessed Hicks fax the excuse slip.

Hampton testified that she did not receive the medical excuse slip allegedly faxed on November 2, 2004, and Hicks testified that she could not recall whether she faxed the note two years

earlier. Hicks also stated that her particular fax machine did not produce confirmations indicating whether particular faxes were successfully transmitted.

However, Hicks testified that her usual practice was to copy the excuse note onto an eight-and-a-half by eleven sheet of paper, stand and wait for the fax machine to process the document, and then initial and date the document after the fax machine beeped, indicating that the document had been successfully faxed. The note dated November 2, 2004, and excusing Barrett's absence on November 1, 2004, was copied onto an eight-and-a-half by eleven sheet of paper addressed to "ATTENTION CAROLYN – 1-313-267-2063." Also written on the document were the word "FAXED," the initials "RH" circled, and the date "11/02/04." After examining the document at trial, Hicks confirmed that the notations were made in her handwriting and testified that "[i]t means that I faxed this document over on this date." Phone records indicate that a phone call was made from Hicks's fax number to 313-267-2063 on November 2, 2004. Hampton confirmed that 313-267-2063 is the number to her fax machine. She further conceded that she may have lost the fax and that if she had received the fax, she would have inquired further about Barrett's absence on November 1.

After his appointment with Dr. Maribao on November 2, Barrett returned home to prepare for his shift. While at home, he received a phone call from Hampton. Barrett's and Hampton's testimony about the substance of that call differed.

According to Barrett, immediately after he and Hampton identified themselves on the phone, Hampton informed him that "you were absent yesterday on the first. That was your seventh occurrence. And per policy after the attendance policy, you are hereby terminated." Barrett told

Hampton that he understood her position, Hampton and Barrett told each other that they were sorry "it didn't work out," and Barrett concluded by stating, "But if you're sick, you're sick." Barrett testified that Hampton did not ask him why he was absent on November 1, and he conceded that he did not volunteer that information because he believed that Hampton had received the faxed copy of his doctor's excuse.

According to Hampton, "I asked [Barrett] what was going on with him? You missed yesterday." Hampton emphasized that "I was looking for anything, any reason as to why he didn't come in the previous day" and that any one of the exceptions under the attendance policy would have saved Barrett's job. In their conversation, Barrett offered Hampton no explanation about why he was absent the previous day, and she conveyed to him that he was a good employee whom Detroit Heading did not want to lose. "I went further, and says, Don, you know, you understand you are going to be terminated. He says, do what you have to do. I do not want any special favors." She also stated that "[a]t that time I didn't know what to think. I didn't know, you know, he had another job or whatever."

Although Hampton stated that her reason for calling Barrett on November 2 was to inquire why he was absent the previous day and to discover whether extenuating circumstances might excuse the absence, she conceded at trial that she did not specifically ask Barrett why he was absent:

Q.      You did not ask him why he was absent on November 1, 2004, did you?

A.      I did not ask him specifically.

\* \* \*

Q.     Did you ask him[] why he missed yesterday?

A.     No, I did not.

* * *

Q.     But you never actually made the inquiry of him and asked him why were you absent yesterday?

A.     No, sir, I never made the inquiry.

In addition, although Hampton testified that she believed Barrett had an obligation to share more information with her about the reason for his absence during their telephone communication on November 2, 2004, she also agreed that she "had an obligation to ask more." In other words, the parties agree that during their November 2 conversation, Hampton "didn't ask" and Barrett "didn't tell."

Moreover, Hampton testified that, although she knew that Mrs. Barrett had called Detroit Heading the previous day and spoke to Weddington, she admitted that she did not ask Weddington why Barrett was absent from work on November 1, 2004. Nor did Weddington inform Hampton of his November 1, 2004, conversation with Mrs. Barrett. Hampton agreed that had Weddington informed her of the substance of Rose Barrett's telephone communication on November 1, 2004, she "would have picked up the phone . . . and called Mr. Barrett" to inquire whether his absence was for a "qualifying disability." According to Weddington, Detroit Heading did not involve him in its decision to terminate Barrett.

On November 3, 2004, Hampton sent Barrett a letter confirming his termination. The letter memorialized that Detroit Heading's reason for terminating Barrett was his absence on November 1,

2004, which, under the attendance policy, required his discharge. Hampton also acknowledged at trial that because Barrett had accumulated his seventh occurrence on November 1, 2004, his absence on that date was the cause of his termination.

## II.

On June 14, 2005, Barrett filed a complaint against Detroit Heading and Carolyn Hampton, in her individual capacity, in the United States District Court for the Eastern District of Michigan. The one-count complaint alleged that Detroit Heading and Hampton violated the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*., by unlawfully terminating Barrett for a serious health condition that rendered him unable to perform his job.

The district court denied the parties' cross-motions for summary judgment, and the case proceeded to a four-day trial. Barrett called as witnesses Rose Barrett, Rose Hicks, Ken Weddington, Carolyn Hampton, Dr. Maribao (by video deposition), and himself. Defendants called no additional witnesses. At the close of evidence, defendants moved for a directed verdict, which the district court denied.

The court instructed the jury without objection. In addition to the standard instructions about burden of proof, evidence, and credibility determinations, the court informed the jury about the elements of a claim alleging a violation of the FMLA. The parties stipulated that defendants were employers and that Barrett was an eligible employee covered by the FMLA. Pertinent to this appeal, the district court also instructed the jury:

It is also plaintiff's burden to prove that he gave Ms. Hampton sufficient notice from which she could determine that he had a serious health condition that incapacitated him on November 1, 2004.

The law requires that an employee provide complete and truthful information to his employer about his condition. If the plaintiff cannot prove each and every one of these elements, the inquiry is over and the judgment should be entered in favor of the defendants.

* * *

When the approximate timing of the need for leave is foreseeable, the employee should give notice as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for a leave, except in extraordinary circumstances where such notice is not feasible.

The employee should provide notice to the employer either in person or by telephone, telegraph, fax, or other electronic means. Notice may be given by an employee's spokesperson, for example, a spouse, adult family member or other responsible party if the employee is unable to do so personally.

The employee need not expressly assert rights under the Act or even mention the Act, but may only state that leave is needed.

It is the employer's responsibility to designate an absence as FMLA qualifying. The employer's designation must be based only on the information received from the employee or the employee's spokesperson where the employee is incapacitated and unable to do so personally.

There is sufficient information to put an employer on notice when the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job.

An employee gives his employer sufficient notice that he is requesting leave for an FMLA qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in the FMLA has occurred.

> If an employee provides sufficient notice to the employer that an absence may be covered by the Act, the employer will be expected to obtain any additional required information through informal means.

The court provided jurors with written copies of the instructions.

Defendants objected to the district court's exclusion from the verdict form of their proposed interrogatory, which would have required the jury to find whether Barrett gave "complete and truthful information about his condition that enabled [each defendant] to conclude that his November 1, 2004 absence was protected by the FMLA." The court overruled the objection.

The jury returned a verdict in favor of Barrett and against Detroit Heading but found that Hampton was not liable. Thereafter, Detroit Heading filed a motion for judgment as a matter of law, arguing that Barrett failed, as a matter of law, to provide sufficient notice to Detroit Heading that his absence on November 1, 2004, was covered by the FMLA. The motion also asserted that the jury's finding that Hampton did not violate the FMLA could not be reconciled with its finding that Detroit Heading did violate the FMLA. Specifically, the motion stated that "[b]ecause Hampton was acting individually and on behalf of Detroit Heading at the time she spoke with Plaintiff, Detroit Heading as a matter of law also cannot be held liable." The district court issued an opinion denying the motion and entered judgment in Barrett's favor in the amount of $95,970.18, which included $45,000.00 in damages pursuant to the verdict, $46,257.00 in attorney fees, and $4,713.18 in court costs.

Detroit Heading timely appeals.

### III.

Detroit Heading first contends that the evidence at trial did not support the jury's finding that Barrett provided sufficient notice to it that his absence on November 1, 2004, was for an FMLA-qualifying reason. Specifically, although Detroit Heading concedes that Barrett provided enough information about his medical condition to trigger a duty on its part to make further inquiry about whether the absence qualified for protection under the FMLA, Detroit Heading argues that Barrett failed "to cooperate and share full and complete truthful information" once it purportedly satisfied its duty through Weddington's return call to Mrs. Barrett on November 1 and Hampton's call to Mr. Barrett on November 2. According to Detroit Heading, it, "like all other employers, is not clairvoyant; it does not know what the Plaintiff's condition is unless and until the Plaintiff honestly and completely shares his medical information with the employer." Detroit Heading complains that neither Mr. Barrett, his wife, nor the excuse slip from Dr. Maribao suggested that Barrett was "disabled" from working on November 1: "Notifying an employer that an employee's blood pressure is 'up' or 'elevated' is hardly evidence that the employee is disabled from working." Detroit Heading also emphasizes that the Barretts withheld the following information from it:

1.      That Mr. Barrett's blood pressure was 180/110 on November 1st;

2.      That Dr. Maribao's office spoke to Mrs. Barrett on November 1st;

3.      That Dr. Maribao, through Rose Barrett, instructed Mr. Barrett to take his medication, stay in bed, and take November 1st off;

4.      That Mr. Barrett saw Dr. Maribao on November 2nd;

5.      That Dr. Maribao provided Mr. Barrett with a note on November 2nd excusing his absence from work on November 1st for hypertensive urgency;

6.      That Ms. Hicks allegedly faxed the note to Carolyn Hampton on November 2nd; and

7.      That Mr. Barrett had the original copy of Dr. Maribao's note in his pocket when he spoke to Carolyn Hampton on November 2nd.

Detroit Heading further maintains that it was improper for Barrett to assume that Hampton received the fax from Dr. Maribao's office and that Barrett had "ample opportunity" to explain the reason for his absence when Hampton telephoned him. Thus, according to Detroit Heading, "the central issue in this [a]ppeal" is "once an employer makes contact with an employee through informal means, what obligations does the employee have to cooperate and share information so that the employer can have all information available and necessary to make a proper determination of an employee's eligibility for FMLA leave[?]"

A denial of a motion for judgment as a matter of law is reviewed de novo. *Fuhr v. Sch. Dist. of Hazel Park*, 364 F.3d 753, 757 (6th Cir. 2004) (citation omitted). Under Federal Rule of Civil Procedure 50(a)(1), a motion for judgment as a matter of law may only be granted if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on an issue fully heard during a jury trial. *See also Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 544 (6th Cir. 2003) (quoting FED. R. CIV. P. 50(a)(1)). Further, in assessing the merits of such a motion, "[a]n appeals court is not to weigh the evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." *Bowman*, 350 F.3d at 544 (internal quotations and citation omitted). Instead, the evidence must be viewed "in the light most favorable to the opposing party, drawing all reasonable inferences in its favor." *Id.* "[O]nly if a complete absence of proof exists on

a material issue in the action, or if no disputed issue of fact exists on which reasonable minds could differ" should a court grant the motion. *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 427 (6th Cir. 2004) (citation omitted).

Congress enacted the FMLA because it determined that "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). As it relates to this case, the FMLA entitles an eligible employee to a total of twelve weeks of leave during a twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). "Any employer who violates [the FMLA is] liable to any eligible employee affected" for damages, equitable relief, reasonable attorney's fees, reasonable expert witness fees, and other costs. 29 U.S.C. § 2617(a).

To prove that an employer interfered, restrained, or denied an employee his rights under the FMLA, the employee must establish that:

1.      he was an eligible employee;

2.      the defendant was an employer as defined under the FMLA;

3.      the employee was entitled to leave under the FMLA;

4.      the employee gave the employer notice of his intention to take leave; and

5.      the employer denied the employee FMLA benefits to which he was entitled.

*Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (citing *Cavin v. Honda of Am. Mfg.,*

*Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)).

Detroit Heading challenges only the fourth requirement, that is, whether Barrett gave it notice

of his intention to take leave under the FMLA.  Because Barrett's absence on November 1, 2004,

was "unforeseeable" in that it was not "based on . . . planned medical treatment for a serious health

condition of the employee or of a family member . . . ." under 29 C.F.R. § 825.302(a), the notice

requirements set forth in 29 C.F.R. § 825.303(b) apply and provide, in relevant part:

> Content of notice.  An employee shall provide sufficient information for an employer
> to reasonably determine whether the FMLA may apply to the leave request.
> Depending on the situation, such information may include that a condition renders
> the employee unable to perform the functions of the job; that the employee is
> pregnant or has been hospitalized overnight; whether the employee or the employee's
> family member is under the continuing care of a health care provider; . . . .  When an
> employee seeks leave for the first time for a FMLA-qualifying reason, the employee
> need not expressly assert rights under the FMLA or even mention the FMLA.
> Calling in "sick" without providing more information will not be considered
> sufficient notice to trigger an employer's obligations under the Act.  The employer
> will be expected to obtain any additional required information through informal
> means.  An employee has an obligation to respond to an employer's questions
> designed to determine whether an absence is potentially FMLA-qualifying.  Failure
> to respond to reasonable employer inquiries regarding the leave request may result
> in denial of FMLA protection if the employer is unable to determine whether the
> leave is FMLA-qualifying.

29 C.F.R. § 825.303(b).  In addition, 29 C.F.R. § 825.301(b), provides, in pertinent part:

> Employee responsibilities. An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave and otherwise satisfy the notice requirements set forth in § 825.302 or § 825.303 depending on whether the need for leave is foreseeable or unforeseeable. An employee giving notice of the need for FMLA leave must explain the reasons for the needed leave so as to allow the employer to determine whether the leave qualifies under the Act. If the employee fails to explain the reasons, leave may be denied. In many cases, in explaining the reasons for a request to use leave, especially when the need for the leave was unexpected or unforeseen, an employee will provide sufficient information for the employer to designate the leave as FMLA leave. An employee using accrued paid leave may in some cases not spontaneously explain the reasons or their plans for using their accrued leave. However, if an employee requesting to use paid leave for a FMLA-qualifying reason does not explain the reason for the leave and the employer denies the employee's request, the employee will need to provide sufficient information to establish a FMLA-qualifying reason for the needed leave so that the employer is aware that the leave may not be denied and may designate that the paid leave be appropriately counted against (substituted for) the employee's FMLA leave entitlement. Similarly, an employee using accrued paid vacation leave who seeks an extension of unpaid leave for a FMLA-qualifying reason will need to state the reason.

The employer's responsibilities in designating leave under the FMLA are set forth in 29 C.F.R. § 825.301(a):

> Employer responsibilities. The employer's decision to designate leave as FMLA-qualifying must be based only on information received from the employee or the employee's spokesperson (e.g., if the employee is incapacitated, the employee's spouse, adult child, parent, doctor, etc., may provide notice to the employer of the need to take FMLA leave). In any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee or the spokesperson to ascertain whether leave is potentially FMLA-qualifying. Once the employer has acquired knowledge that the leave is being taken for a FMLA-qualifying reason, the employer must notify the employee as provided in § 825.300(d).

We have stated that "the critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the

employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004). "What is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Walton*, 424 F.3d at 486 (quoting *Cavin*, 346 F.3d at 724).

At the outset, we acknowledge that the undisputed facts demonstrate communication errors by *both* parties.[2] Nevertheless, sufficient evidence supports the jury's verdict that Barrett and his "spokesperson" – his wife – provided adequate notice to Detroit Heading that his November 1 absence may have qualified for leave under the FMLA and that Detroit Heading failed to satisfy its obligation to make further inquiry, thus violating the FMLA when it terminated Barrett. Viewed in the light most favorable to Barrett and drawing all reasonable inferences in his favor, the evidence presented at trial established that: (1) Detroit Heading had a duty to inquire whether Barrett's November 1 absence qualified for protection under the FMLA; and (2) Detroit Heading did not satisfy its obligation to make the required inquiry.

A.

---

[2]Mr. Barrett admitted that he had his fair share of attendance problems at Detroit Heading for reasons related and unrelated to his hypertension, that he pushed Detroit Heading's attendance policy to its limit, that he did not verbally inform Hampton when she called him on November 2 that Dr. Maribao instructed him to stay home and rest on November 1 because of hypertensive urgency, that he did not inform Hampton in that same call that he just returned from an appointment with Dr. Maribao concerning the episode of hypertensive urgency that led to his absence, and that he did not verify that Hampton received the fax from Dr. Maribao's office excusing him from work on November 1. Rose Barrett also acknowledged that she did not inform Weddington in their November 1 conversation that Dr. Maribao instructed her husband to stay home and rest.

Detroit Heading concedes that it incurred a duty to inquire whether Barrett's absence on November 1, 2004, was for an FMLA-qualifying reason. Nevertheless, because the evidence on which that duty arose is pertinent to the analysis of whether Detroit Heading satisfied its obligation to make further inquiry, we set forth the relevant evidence below.

First, Barrett had a history of severe hypertension of which Detroit Heading was aware. Barrett disclosed on his pre-employment questionnaire that he had been treated for "abnormal blood pressure." On eight different occasions during a three-year period, Dr. Maribao wrote notes excusing Barrett from work for "uncontrolled hypertension" or "hypertension urgency." The majority of those notes excused Barrett for *multiple* days and weeks, ranging from one week to six weeks. Hampton and Weddington reviewed the notes, and Weddington testified that he knew Barrett had high blood pressure. Construed in the light most favorable to Barrett, Detroit Heading knew not only that Barrett suffered from a specific disorder – hypertension – but also that his hypertension could be severe and disabling.

Second, on November 1, 2004, Rose Barrett left a message for Weddington, a proper employee to notify, that her husband would be absent that day because his blood pressure was elevated. She invited Weddington to return her call, which he did, and she then conveyed to Weddington her husband's *precise* blood pressure reading. Weddington acknowledged at trial that Mrs. Barrett pleaded for an emergency vacation day on her husband's behalf.

Finally, Hampton received Dr. Maribao's faxed note excusing Barrett from work on November 1, 2004, as the result of "hypertensive urgency" but misplaced or ignored it. Not only did

Barrett testify that he witnessed Hicks fax the note, but it allegedly was addressed to "Carolyn" at Hampton's correct fax number, was inscribed with the notation "FAXED," and was initialed by Hicks and dated November 2, 2004, the date on which Hicks allegedly faxed it. Moreover, telephone records confirm that a call or fax was indeed transmitted from Hicks's fax machine number to Hampton's fax machine number on November 2, 2004.

For all these reasons, Detroit Heading was apparently forced to concede that its duty to make further inquiry was triggered.

B.

Detroit Heading contends that it satisfied its obligation to make further inquiry about whether Barrett's November 1 absence was for an FMLA-qualifying reason. It asserts that it fulfilled its duty to inquire when Weddington and Hampton contacted the Barretts by telephone on November 1 and November 2, respectively. It complains that in response to those inquiries, the Barretts failed to provide "complete and truthful information[,]" thus preventing it from determining whether Mr. Barrett's absence was FMLA-qualifying. Under the applicable standards for assessing the merits of a motion for judgment as a matter of law, however, sufficient evidence presented at trial supports the jury's implied determination that Detroit Heading failed to make the required inquiry for several reasons.

First, although Weddington agreed that Rose Barrett informed him on November 1 that her husband could not work that day because his blood pressure was "elevated," communicated the blood pressure reading to him, and pleaded for an emergency vacation day on behalf of her husband,

Weddington also conceded at trial that he did not ask her any questions and that Mrs. Barrett told him everything he wanted to know. In addition, Hampton agreed that the information Mrs. Barrett provided to Weddington during the November 1 phone call was sufficient "to require Detroit Heading to inquire further to determine whether the leave was potentially protected by the Family Medical Leave Act."[3] Further, Hampton testified that had Weddington relayed to her his conversation with Rose Barrett, she "would have picked up the phone . . . and called Mr. Barrett" to inquire further. Yet Weddington and Hampton admitted that they made no such inquiry.

Second, Hampton conceded at trial that if she received the November 2 medical excuse allegedly faxed to her from Dr. Maribao's office, she would have inquired further. As previously noted, however, the jury could have reasonably concluded that Hampton *did* receive the fax but either misplaced it or ignored it.

Third, the jury could have appropriately determined that Hampton's sole purpose in calling Mr. Barrett on November 2, 2004, was simply to notify him that he was terminated, not to inquire about the circumstances surrounding his absence on the preceding day. Indeed, although Hampton characterized her motive for calling as "looking for anything, any reason as to why [Barrett] didn't come in the previous day" so that she could save his job, she admitted that she did not even ask Barrett why he was absent. She even conceded at trial that she "had an obligation to ask more."

---

[3]We note that defendants did not object to this question which elicited Hampton's opinion, nor did they argue in their appellate briefs that the question posed by Barrett's attorney was improper.

Fourth, Detroit Heading assumes, without citing any authority, that mere telephone calls by Weddington and Hampton satisfied its duty of "inquiry." An "inquiry" is "[a] request for information." *Black's Law Dictionary* 808 (8th ed. 2004). Based on the admissions by Weddington and Hampton that they did not ask questions, we find no merit to Detroit Heading's argument that it "requested information" simply by dialing a phone number and exchanging pleasantries.

Fifth, both Weddington and Hampton testified consistently that they failed to communicate with *each other* about Barrett's absence on November 1. Hampton never asked Weddington about his conversation with Rose Barrett, although she knew that he had spoken to Mrs. Barrett, nor did Weddington transmit the information conveyed to him by Mrs. Barrett to Hampton.

Finally, the jury could have properly reasoned that Detroit Heading did not make the required inquiry because it did not understand its obligations under the FMLA or was simply not interested in complying with the FMLA. As grounds for that possible conclusion, the jury might have inferred that Hampton simply "brushed off" Barrett's request for FMLA when he allegedly sought information about it in the summer of 2004. Based on Barrett's testimony that Hampton told him that "there was a lot involved in getting that together," that "[i]t would take her a little bit of time," and that "she didn't think that [Barrett] would qualify under hypertension for Family Medical Leave Act," the jury could have reasonably concluded that Hampton believed it to be too difficult and time-consuming to complete and process the required paperwork for FMLA leave and that she therefore ignored the law.

In essence, Barrett presented sufficient evidence to support the jury's implied finding that Detroit Heading failed to make the required inquiry. Accordingly, its argument that the Barretts failed to provide "complete and truthful information" once Detroit Heading allegedly satisfied its obligation to inquire is moot. Assuming that Detroit Heading did not perform the required inquiry, the Barretts could not have provided additional "complete and truthful" information because Detroit Heading made no attempt to *elicit* that information.

C.

None of the cases upon which Detroit Heading relies supports its contention that the jury lacked a sufficient evidentiary basis for its verdict. All of the plaintiffs in the decisions cited by Detroit Heading refused to comply with reasonable requests by their employers about their health conditions, rejected their employers' offers to help them complete the necessary FMLA forms, provided no medical documentation of their serious health conditions to their employers, spoke in general terms about their health such that the employer could only speculate about it, or did not have serious health conditions covered by the FMLA. *See Greenwell v. State Farm Mut. Auto Ins. Co.*, 486 F.3d 840 (5th Cir. 2007) (holding that plaintiff did not provide sufficient notice under the FMLA where she provided no medical documentation from a doctor confirming a serious medical condition, refused to complete an FMLA form which her employer provided and invited her to fill out, and conveyed to her employer that the partial cause of her absence was "asthma" without mentioning that her asthma was an "asthmatic flare-up related to [a] chronic condition."); *McCarron v. British Telecom*, No. CIV.A. 00-CV-6123, 2002 WL 1832843 (E.D. Pa. 2002) (holding that plaintiff failed

to provide sufficient notice under the FMLA where he "required leave to remedy a 'family situation,'" refused to respond to his employer's request to provide "details" about his absence, and told his employer to "leave him alone" after the employer twice left voice mails offering to help him process FMLA forms, requested that plaintiff call, and warned plaintiff of the consequences of not providing a reason for leave); *Walton v. Ford Motor Co.*, 424 F.3d 481 (6th Cir. 2005) (holding that plaintiff did not provide sufficient notice of a serious health condition under the FMLA where he informed his employer that he had "twisted his knee," returned to work after receiving an ice pack and ibuprofen at his employer's medical department, made no attempt to contact his employer during his leave, failed to respond to a 5-day quit letter, did not submit any medical paperwork until nearly two weeks after his employer terminated him, and told his employer that he was taking a "sick day"); *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412 (6th Cir. 2004) (holding that employer satisfied its duty to inquire by requesting that plaintiff provide medical certification confirming that his absence was, in fact, caused by diabetes and plaintiff refused to comply); *Beaver v. RGIS Inventory Specialists, Inc.*, 144 F. App'x 452 (6th Cir. 2005) (holding that plaintiff's diagnoses of sinusitis, bronchitis, and ear infection were "routine, short-term illnesses not covered by the FMLA," that plaintiff did not sufficiently notify her employer that she required FMLA leave because "[s]he used very general terms when describing her health such as she 'didn't feel good,' was 'sick,' and 'needed a couple of days to get better, a few days,'" and "did not indicate that she could not work due to illness" upon her return to work); *Reich v. Midwest Plastic Eng'g*, No. 1:94-CV-525, 1995 WL 514851 (W.D. Mich. 1995) (holding that plaintiff failed to provide sufficient information to her

employer that her leave resulted from a "serious health condition" because "she did not communicate that she was under the continuing treatment of a health care provider for her condition of chicken pox," "did not communicate that she had received inpatient care at Vencor Hospital as the result of her having chicken pox[,]" failed to "bring in a doctor's slip verifying her condition," and did not update her employer about her medical status and intent to return to work upon the employer's demand); *Leakan v. Highland Cos.*, No. 96-CV-75445-DT, 1997 WL 33812215 (E.D. Mich. 1997) (holding that plaintiff who requested leave "in order to take a vacation to North Carolina" did not qualify for leave under the FMLA); *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973 (5th Cir. 1998) (holding that plaintiff failed to sufficiently notify her employer of FMLA-qualifying condition where "the *only* information [she] imparted to Wal-Mart prior to its discharge decision was a note delivered to Wal-Mart by her mother . . . advising that [plaintiff] 'was having a lot of pain in her side,' and would not be able to work that day, but would like to make it up on one of her days off; and her mother's statement . . . that [plaintiff] was 'sick.'"); *Doughtie v. Ashland, Inc.*, No. 03-2073 ML/AN, 2005 WL 1239286 (W.D. Tenn. 2005) (holding that plaintiff's tonsillectomy did not qualify as a serious health condition, and even if it did, plaintiff failed to sufficiently inform his employer that his absence potentially qualified for FMLA leave where he "did not provide [it] with any medical documentation to show the extent or seriousness of his condition or any time frame upon which he was medically cleared to return to work.").

The facts in those decisions are readily distinguishable from those in this case. Unlike the plaintiffs in the decisions cited, Barrett had a history of a specific health condition – hypertension

– that had previously disabled him for weeks; Detroit Heading does not dispute on appeal that Barrett's condition qualified as a "serious health condition" under the FMLA; Detroit Heading had actual and constructive notice of that condition; Barrett's wife specifically articulated to Detroit Heading that her husband's blood pressure was elevated on November 1, 2004, even informing it of his actual blood pressure reading; Barrett's physician faxed a note to Detroit Heading on the day immediately following the absence; the note informed Detroit Heading that Barrett had suffered a "hypertensive urgency" the previous day; phone records and notations on the faxed document confirmed that the document was indeed faxed; Detroit Heading concedes that Barrett and his wife provided sufficient information to trigger a duty on its part to inquire further; and the supervisory employees to whom the Barretts communicated the information about Mr. Barrett's absence admitted that they did not ask questions about the absence, conceded that they did not even communicate with *each other* about Barrett's absence, and agreed that they should have asked more questions. For these reasons, a sufficient evidentiary basis supports the jury's verdict against Detroit Heading.

D.

Although not made explicit in its appellate brief, Detroit Heading argued in its motion for judgment as a matter of law and implies in its brief that the verdict against it is inconsistent with the verdict in favor of Hampton. Specifically, Detroit Heading suggests that because Hampton is an agent and vice president of Detroit Heading, it cannot be liable if the jury did not find Hampton liable as well. The argument is without merit.

The Supreme Court has stated that "[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment." *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962). Moreover, we have emphasized that "it is incumbent upon a trial court, as well as an appellate court, to reconcile the answers if possible under any view of the evidence in the case." *Waggoner v. Mosti*, 792 F.2d 595, 597 (6th Cir. 1986) (internal quotations and citation omitted). "Federal law favors the harmonization of verdicts and answers to interrogatories wherever that is reasonably possible." *Jewell v. Holzer Hosp. Found., Inc.*, 899 F.2d 1507, 1510 (6th Cir. 1990) (citation omitted). "[E]ven if the answers to jury interrogatories and the verdict do conflict, federal law favors upholding the verdict if there exists some legal basis, supported by the evidence, upon which the verdict could be based." *Id.* (citing *Panhandle & Santa Fe Ry. Co.*, 353 U.S. 360, 361 (1957)).

In rejecting Detroit Heading's argument that the verdicts were irreconcilable, the district court explained:

> [I]t is possible from the evidence introduced at trial that the jury could have concluded that Hampton never received sufficient notice of Plaintiff's high blood pressure. Rose Barrett left a voicemail for Weddington and Weddington called her back; both of those "conversations" resulted in Weddington being told that Plaintiff's blood pressure was up. Hampton testified that she never discussed with Rose Barrett, Plaintiff or Weddington the reason for Plaintiff's absence on November 1, 2004. Hampton also testified that she never received the fax from Dr. Maribao's office. Accordingly, there was no evidence at trial that expressly demonstrated that Hampton knew that Plaintiff's blood pressure was up, yet there was evidence that agents of Defendant were aware of Plaintiff's condition.

Consistent with the district court's reasoning, the jury could reasonably have determined that the information conveyed by Rose Barrett to Weddington was sufficient in itself to place Detroit Heading on notice that her husband's absence was potentially covered by the FMLA, thus excusing Hampton from being liable. We also note that Weddington, as Barrett's immediate supervisor, likely had greater knowledge about Barrett than Hampton. In fact, Weddington's testimony confirms that observation. Weddington testified that he knew, based on his conversations with Barrett, that Barrett suffered from hypertension. Therefore, the jury could have appropriately imputed Weddington's "superior" knowledge to Detroit Heading. In this way, the purported "inconsistent" verdicts can be reconciled.[4]

IV.

Finally, Detroit Heading contends that the district court abused its discretion in denying its proposed verdict interrogatory which would have required the jury to find whether Barrett gave "complete and truthful information about his condition that enabled it to conclude that his November 1, 2004, absence was protected by the FMLA." Detroit Heading argues that by omitting this proposed interrogatory, the district court improperly permitted the jury to "skip[] an intermediate step in the analysis, and one of Detroit Heading's defenses – whether Plaintiff provided complete and truthful information to Detroit Heading so that it knew his absence on November 1, 2004 was FMLA qualifying."

---

[4]We also note that the jury may simply have been unwilling to find fault with an individual employee rather than with a corporation. Detroit Heading does not argue, and cites no authority, that the jury's verdict should be overturned on that basis.

As a threshold matter, Barrett counters that Detroit Heading waived this issue on appeal because it failed to set forth the issue in the "issues presented for review" section of its appellate brief. We agree. Under Federal Rule of Appellate Procedure 28(a)(5), "[t]he appellant's brief *must* contain, under appropriate headings and in the order indicated: a statement of the issues presented for review[.]" (Emphasis added.) The provisions of Rule 28(a) are therefore unambiguously mandatory. *See United States v. Baylor*, 517 F.3d 899, 903 (6th Cir. 2008) (Rule 28(a) "*requires* the appellant's brief to contain, *inter alia*, 'a statement of the issues presented for review . . . .'"). (Emphasis added.) In *United States v. Ballard*, 280 F. App'x 468 (6th Cir. 2008), we stated that "[i]ssues that are not presented in accordance with [Rule 28(a)] are not preserved." *Id*. at 471 n.1 (citing *Baylor*, 517 F.3d at 903). Therefore, because Detroit Heading failed to identify the district court's exclusion of its proposed verdict interrogatory as an issue in its "statement of the issues presented for review," we deem it waived.

Even if Detroit Heading properly preserved the issue, it is without merit. A district court's decisions regarding jury instructions and verdict interrogatories are reviewed for abuse of discretion. *United States v. Hammon*, 277 F. App'x 560, 568 (6th Cir. 2008). "[A] judgment will only be reversed if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id*. (quoting *United States v. Harrod*, 168 F.3d 887, 892 (1999)) (internal quotations and citation omitted).

The district court did not abuse its discretion in excluding the proposed interrogatory from the verdict form for several reasons. First, Detroit Heading's argument is moot because it concedes

that the Barretts shared enough information about Mr. Barrett's health condition to impose upon it the duty to inquire further. Because sufficient evidence establishes that Detroit Heading did not fulfill that duty, the purported obligation to share "complete and truthful" information was never triggered. Accordingly, any alleged error was harmless and not grounds for reversal.

Second, Detroit Heading cites no authority suggesting that the district court was required, or even that it would have been proper, to include its proposed "complete and truthful" interrogatory on the verdict form. The FMLA requires only that the employee provide "sufficient" or "reasonably adequate" notice to the employer. "What is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Walton*, 424 F.3d at 486 (quoting *Cavin*, 346 F.3d at 724). Based on the regulatory requirements and decisions interpreting them, Detroit Heading therefore improperly requested a *higher* standard of notice than that which the law actually requires.

Third, the district court, at Detroit Heading's request, instructed the jury that "[t]he law requires that an employee *provide complete and truthful information to his employer about his condition*. If the plaintiff cannot prove each and every one of these elements, the inquiry is over and the judgment should be entered in favor of the defendants." (Emphasis added.) Therefore, although the court did not include the proposed "complete and truthful" interrogatory on the *verdict* form, we must presume that the jury considered whether Barrett provided Detroit Heading with "complete and truthful information about his condition" because the district court *required* it to do so in the *instructions* it gave.

Finally, the proper setting in which to argue that the Barretts provided insufficient notice was not on the verdict form; rather, it was during opening and closing arguments. And because the district court read its instructions to the jury *prior* to closing arguments, Detroit Heading could have "exploited" the "complete and truthful" instruction by, for example, publishing and emphasizing the instruction to the jury.

For all of these reasons, the district court did not abuse its discretion in excluding Detroit Heading's proposed interrogatory from the verdict form.

V.

In conclusion, the evidence provided a sufficient basis from which a reasonable jury could have found that Barrett provided Detroit Heading with the required notice of his intention to take leave under the FMLA and that Detroit Heading violated the FMLA when it terminated him. Moreover, the district court did not abuse its discretion in excluding Detroit Heading's proposed interrogatory from the verdict form. Accordingly, we affirm the appealed rulings of the district court.